Vernon **MASAYESVA,** Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, For and on Behalf of the Hopi Indian Tribe, Plaintiff,

v.

Peterson **ZAH,** Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, For and on Behalf of the Navajo Indian Tribe, Defendant.

Civ. No. 74–842 PCT EHC.

United States District Court, D. Arizona.

Sept. 25, 1992.

Order on Motion to Alter or Amend Judgment, Dec. 21, 1992.

Amended Final Judgment, Dec. 21, 1992.

Order on Motion for Partial Stay Pending Appeal, Dec. 21, 1992.

James E. Scarboro, Alfred T. McDonnell, Mary Gabrielle Sprague, David C. Warren, James J. Tutchton, Arnold & Porter, Denver, CO, W. Scott Bales, Lawrence A. Hammond,

Meyer, Hendricks, Victor, Osborn & Maledon, P.A., Phoenix, AZ, for plaintiff.

Terry E. Fenzl, Craig W. Soland, John W. Rogers, Peter J. Osetek, Mary Jo Rudd, Shirley Ann Kaufman, Rebecca A. Tsosie, Brown & Bain, P.A., Phoenix, AZ, for defendant.

Kim Jerome Gottschalk, Robert Meyer Peregoy, Native American Rights Fund, Boulder, CO, for intervenors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT RE: PARTITION OF THE 1934 RESERVATION

CARROLL, District Judge.*

## I. BACKGROUND

Plaintiff Vernon Masayesva is the duly authorized Chairman of the Hopi Tribal Council of the Hopi Tribe, and appears herein as representative of the Hopi Tribe and its villages, clans and individual members. Defendant Peterson Zah is the duly authorized Chairman of the Navajo Tribal Council, and appears herein as representative of the Navajo Nation [1] and its chapters, clans, and individual members.

In 1974, the Hopi Tribal Chairman commenced this action pursuant to 25 U.S.C. § 640d–7 [2] to determine Hopi rights and interests in the reservation created by the Act of June 14, 1934, 48 Stat. 960 (1934) (the "1934 Act"). The 1934 Act described the external boundaries of the Navajo Reservation, and conveyed an equitable interest in certain of these lands to the Navajo Nation and "such other Indians as may already be located thereon." [3] The Hopis lived in the Village of Moenkopi and used adjacent areas in 1934, and were "such other Indians" entitled to an equitable interest in the 1934 Reservation.

This lawsuit is the second action between the Navajo Nation and the Hopi Tribe to settle title in reservation lands in northeast-

---

* Kristen Rosati, the law clerk who worked tirelessly on this case and pending proceedings involving the 1882 Reservation for a full year, has honored me by her outstanding efforts in those regards. She asked for the assignment when it became available, little suspecting I am sure what it would entail. Her interest, commitment to the development of a thorough explication of the record in Phases I and II, and her thoughtful analysis of the statutes and case law, represent the best a district judge could expect of a law clerk.

1. The Navajo Tribal Code, 1 N.T.C. § 301, requires officials of the Navajo Tribe to use the term "Navajo Nation" rather than "Navajo Tribe". Throughout this opinion, the Court will use the term employed by the Navajos.

2. § 640d–7. *Determination of tribal rights and interest in land.*

 (a) *Authorization to commence and defend actions in District Court*
 Either tribe, acting through the chairman of its tribal council for and on behalf of the tribe, is each hereby authorized to commence or defend in the District Court an action against the other tribe and any other tribe of Indians claiming any interest in or to the area described in the Act of June 14, 1934, except the reservation established by the Executive Order of December 16, 1882, for the purposes of determining the rights and interests of the tribes in and to such lands and quieting title thereto in the tribes.
 (b) *Allocation of land to respective reservations upon determination of interests*

 Lands, if any, in which the Navajo Tribe or Navajo individuals are determined by the District Court to have the exclusive interest shall continue to be a part of the Navajo Reservation. Lands, if any, in which the Hopi Tribe, including any Hopi village or clan thereof, or Hopi individuals are determined by the District Court to have the exclusive interest shall thereafter be a reservation for the Hopi Tribe. Any lands in which the Navajo and Hopi Tribes or Navajo or Hopi individuals are determined to have a joint or undivided interest shall be partitioned by the District Court on the basis of fairness and equity and the area so partitioned shall be retained in the Navajo Reservation or added to the Hopi Reservation, respectively.
 (c) *Actions for accounting, fair value of grazing, and claims for damages to land; determination of recovery; defenses* [Omitted].
 (d) *Denial of Congressional interest in merits of conflicting claims; liability of United States* [Omitted].
 (e) *Payment of legal fees, court costs and other expenses* [Omitted].

3. Section 1 of the 1934 Act provides: To define the exterior boundaries of the Navajo Indian Reservation in Arizona, and for other purposes ... the exterior boundaries of the Navajo Indian Reservation, in Arizona, be, and they are hereby, defined as follows: [legal description of land omitted]. All vacant, unreserved, and unappropriated public lands, ... within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajos and such other Indians as may already be located thereon ..

ern Arizona. The rights of the Navajos and Hopis in a parcel withdrawn by Executive Order on December 16, 1882 ("the 1882 Reservation") were previously litigated in a separate line of cases. *See Healing v. Jones,* 210 F.Supp. 125 (D.Ariz.1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (per curiam); *Hamilton v. MacDonald,* 503 F.2d 1138 (9th Cir.1974).

*Healing* was filed in 1958 pursuant to 72 Stat. 403, P.L. 85–547 (1958), authorizing the suit to settle title to the 1882 Reservation. A three-judge panel held that the 1882 Reservation, except for an area known as "District 6" which was exclusively occupied by Hopis, was a joint use area ("the JUA") for the Navajo and Hopi Indians. After a series of actions to enforce the Hopi Tribe's right to joint use of the JUA with the Navajo Nation, share and share alike, *see, Hamilton v. Nakai,* 453 F.2d 152 (9th Cir.1971), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *Hamilton v. MacDonald,* 503 F.2d 1138 (9th Cir.1974); *Sekaquaptewa v. MacDonald,* 544 F.2d 396 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977), Congress passed the Navajo–Hopi Land Settlement Act, 25 U.S.C. § 640d, *et seq.,* 88 Stat. 1712, P.L. 93–531 (1974) (the "Settlement Act").

The Settlement Act authorized the District Court to partition the JUA (after a mediated negotiation effort by the Tribes), and provided for the relocation of individual Indians who lived on lands partitioned to the other Tribe. After negotiation failed, the District Court partitioned the JUA; the partition order was final on April 18, 1979.

The Settlement Act also authorized the District Court to settle title to the 1934 Reservation. 25 U.S.C. § 640d–7. That section provided that lands in which the Court found the Navajo had exclusive interest would remain a part of the Navajo Reservation, that lands in which the Hopi had an exclusive interest would become a reservation for the Hopi Tribe, and that lands in which the Navajo or Hopi had a joint or undivided interest shall be partitioned by the Court "on the basis of fairness and equity".

On April 27, 1992, this Court issued its Findings of Fact and Conclusions of Law regarding Hopi interest in the 1934 Reservation. The Court held that the use by Hopi Indians in 1934 must have been substantial and sufficiently intensive in order to create a property interest in the 1934 Reservation. (*See* more extended discussion of what constituted sufficient occupation, possession or use in the 4/27/92 Findings.) The earlier Findings generally described the areas which the Hopis had exclusively or jointly used in 1934 based on evidence presented at the trial held between October 17, 1989 and February 8, 1990 (Phase I of this proceeding).[4]

This opinion will more specifically delineate the boundaries of the area which this Court found Hopis had exclusively used, and that area found to have been jointly used by Hopis and Navajos in 1934. This Court will then partition the joint use area, based on standards explained in the next section. The Hopi exclusive use area plus the area partitioned to the Hopi Tribe from the joint use area will become part of the Hopi Reservation. 25 U.S.C. § 640d–7(b).

Trial regarding partition, or "Phase II", commenced on July 7, 1992, and continued until July 21, 1992. Both parties presented extensive evidence about the present-day use by Navajos and Hopis of the area subject to partition, including residential, farming, and grazing use of the land. The parties also presented arguments regarding the appropriate standards for this Court to employ in the partition.

The Court viewed the areas involved in this proceeding on June 27, 1992, in a helicopter-ground tour arranged with the consent of the parties by Dan Jackson, Solicitor's Office, Department of Interior, Phoenix, Arizona.

The helicopter group included Craig Soland, an attorney for the Navajo Tribe, James Scarboro, an attorney for the Hopi

---

4. On July 10, 1992, this Court also issued Findings of Fact and Conclusion of Law regarding claims of the San Juan Southern Paiute Tribe to the 1934 Reservation. This Court held that 25 U.S.C. § 640d, *et seq.* did not authorize a partition of land to the Paiute Tribe, and the Paiutes thus did not participate in Phase II of this litigation regarding partition. The areas which the Paiute Tribe used in 1934 do not overlap with the areas which the Hopi Tribe used in 1934.

Tribe, and Kristen Rosati, the Court's Law Clerk.

We flew over the joint use area and the Hopi exclusive use area. We were able to see the different windmills, stock tanks, grazing areas, homesites, and farming locations, as well as the physical features of the terrain. The Ward Terrace—Moenkopi Plateau escarpment, Pasture Canyon, Coal Mine Mesa, Coal Mine Canyon, Hollow Place and Little Hollow Place were all easily identified.

A representative of each tribe joined the group for the ground tour. We travelled together in one van and essentially toured the two Bennett Freeze Administrative Units, and Kerley Valley as far west as the sewer lagoons. We also drove through the Goldtooth Compound and up to the top of the Moenkopi Plateau. We could look back over Tuba City and Moenkopi Village, and locate the Government Farm and allotment lands.

All agreed that it was a Saturday well spent (and enjoyed) and provided an opportunity to see the case in a different and more understanding perspective. We are particularly indebted to Dan Jackson and the Bureau of Reclamation for the helicopter and the excellent pilot, Mark Santee.

## II. STANDARDS FOR PARTITION

In general, the Hopi Tribe argues for division of the joint use area based on equality of acreage, taking into consideration the other standards provided for the partition of the 1882 Reservation, including avoiding population concentrations and establishing contiguous boundaries. *See,* 25 U.S.C. § 640d–5 (standards for partition of the 1882 Reservation). The Navajos take the position that the primary criteria should be avoiding the relocation of individuals; they also ask the Court to consider present and historical intensity of land use and the fact that Hopis have more land per capita than the Navajos, and to utilize natural topographic features to allow easy administration of boundaries.

The essential dispute between the parties is whether the partition should or must be based on equality of acreage. The following

discussion will examine how the statute, legislative history, the precedent in this case, and *Healing v. Jones* and the partition of the 1882 Reservation may effect this decision.

### 1. *Statutory requirements*

This Court has jurisdiction to partition jointly used lands pursuant to 25 U.S.C. § 640d–7(b):

> Any lands in which the Navajo and Hopi Tribes or Navajo or Hopi individuals are determined to have a joint or undivided interest shall be partitioned by the District Court on the basis of fairness and equity and the area so partitioned shall be retained in the Navajo Reservation or added to the Hopi Reservation, respectively.

The statute does not give the Court guidelines for the application of "fairness and equity".

■ The lack of standards in this section, as compared with section 640d–5 which listed detailed criteria for the partition of the 1882 Reservation, indicates that Congress intended to grant the Court broad discretion in the partition of the 1934 Reservation.

■ Further, in contrast to the partition of the 1882 Reservation, the absence of an "owelty" [5] provision suggests that Congress did not intend equality of acreage and/or value of joint use land to be mandatory in the partition of the 1934 Reservation. *See,* 25 U.S.C. § 640d–5(d) (payment required after division of 1882 Reservation to Tribe receiving land of lesser acreage and/or value).

### 2. *Legislative history*

The legislative history does not provide the Court guidance in determining Congress' intent regarding standards for partition of the 1934 Reservation. There is no discussion regarding the meaning of "fairness and equity".

### 3. *Law of the Case*

■ The Hopi Tribe argues that equal partition of the joint use area is required by

---

**5.** Owelty is "a sum of money paid by one of two coparceners or co-tenants to the other, when a partition has been effected between them, but, the land not being susceptible of division into

exactly equal shares, such payment is required to make the portions respectively assigned to them of equal value." *Black's Law Dictionary* (4th ed.)

precedent. In *Sekaquaptewa v. MacDonald,* 448 F.Supp. 1183, 1996 (D.Ariz.1978) (*Sekaquaptewa I* ), the District Court (Judge Copple) held that the Hopis and Navajos each received an undivided one half interest in lands occupied by Hopis: "Inasmuch as the 1934 Act did not attempt to separate Hopi and Navajo property interests, the Hopi tribe and the Navajo tribe each received an undivided one half interest in these lands." The Ninth Circuit reversed only as to the conclusion that the Navajo Nation received a one half interest in lands which were occupied exclusively by Hopis. *Sekaquaptewa v. MacDonald,* 619 F.2d 801, 809–810 (9th Cir. 1980) (*Sekaquaptewa II* ). The Hopis urge that the Ninth Circuit thus held that the Hopis should receive one half of the joint use acreage upon partition.

However, while it is clear that the Hopi Tribe has a one half interest in the joint use area, neither the District or Circuit Court specifically considered the appropriate standards for partition of that area. The June 2, 1978 Partial Judgment stated, "the Court reserves for future determination all questions relating to partitioning of any such lands." Further, the Ninth Circuit did not direct the District Court on remand to partition joint use lands on an equal basis, requiring only that the District Court "declare title to be joint or undivided, subject to partition." *Sekaquaptewa II,* 619 F.2d at 809.

The law of the case therefore does not dictate that the Hopi Tribe receive one half of the acreage of the joint use area.

4. *The effect of Healing and the partition of the 1882 Reservation*

■ The Hopi Tribe argues that the Court should follow the standards employed in the division of the 1882 Reservation, set forth in 25 U.S.C. § 640d–5(a)–(f).[6] The preamble of section 640d–5 provided that the Court should be guided by the decision in *Healing v. Jones,* 210 F.Supp. 125, in which the Dis-

trict Court held that the Navajo and Hopi Tribes had an equal interest in land in the 1882 Reservation outside of an area held exclusively by the Hopi Tribe (District 6); section 640d–5(d) required that the partition be based on equal acreage and/or value of land *insofar as practicable.* The Hopis argue that this Court should apply the same standards in partitioning the joint use area in the 1934 Reservation.

While the *Healing* court held that Navajos had a *one-half interest* in land which they *exclusively* occupied (most of the land outside District 6), which holding was reflected in the provisions of the Settlement Act regarding partition of the JUA, the Settlement Act treated the 1934 Reservation dispute differently. Recognizing this, the Ninth Circuit in *Sekaquaptewa II* distinguished *Healing* and held that Hopis in the 1934 Reservation would have an *exclusive interest* in lands held *exclusively* by Hopis. In reversing Judge Copple's finding that the Hopi Tribe had a one half interest in lands on which Hopis were exclusively located (applying *Healing* ), the Court stated, "The statute and order in *Healing* used different language in a different legislative setting than the 1934 Act." *Sekaquaptewa II,* 619 F.2d at 807.

As stated in this Court's April Findings, "[a]lthough the 1882 Reservation litigation is not relevant to the disposition of this lawsuit, the events of that dispute provide background understanding of the Navajo–Hopi land dispute, and may guide this Court in various ways in its decision." (4/27/92 Findings, p. 4). The standards utilized in the partition of the 1882 Reservation will be reviewed by the Court as they represent the factors Congress considered important in a very similar dispute. However, equality of acreage or value need not be the *primary* consideration; by failing to specify similar guidelines for the 1934 Reservation dispute, Congress provided discretion for this Court

---

**6.** These factors provided that: (a) Hopi rights and interests in the exclusive Hopi area (District 6) were not to be reduced in any way; (b) partition lines should be drawn to avoid concentrations of population on the reservation of the other tribe to minimize and avoid undue social, economic, and cultural disruption insofar as practicable; (c) reasonable provision should be made for access to religious shrines on the other tribe's land; (d) partitioned land should be equal in acreage and quality insofar as practicable; (e) partitioned land should be contiguous to the reservation of that tribe where feasible and consistent with the provisions of that section; and (f) boundary lines should follow terrain which would facilitate fencing or avoid the need for fencing.

to arrive at appropriate standards to achieve a partition based on "fairness and equity". Thus, equality of acreage and/or value will be only one factor that the Court considers in the partition.

## III. DELINEATION OF EXCLUSIVE USE AND JOINT USE BOUNDARIES

### A. Hopi Exclusive Use Area

This Court's April 27, 1992 Conclusions of Law found that the following areas were exclusively used by Hopis in 1934: (1) the Village of Moenkopi, (2) Reservoir Canyon, (3) certain areas within Moenkopi Wash/Kerley Valley, and (4) part of the central/southern Moenkopi Plateau. (4/27/92 Findings, pp. 77–78). These areas were explained in a more detailed fashion in the April 27, 1992 Findings of Fact, but need further definition. A map of the 1934 exclusive and joint use areas is attached at App. A to this opinion.

### 1. The Village of Moenkopi

The Court found that Hopis exclusively occupied the Village of Moenkopi in 1934, but did not delineate the boundaries of Moenkopi. (4/27/92 Findings, p. 77). The Hopi Tribe argues that the current Moenkopi Administrative Unit, bounded on the north by the Highway 160, should be the boundary for Moenkopi.

██ However, the Moenkopi Administrative Unit boundary was created in 1972 to facilitate the administration of the Bennett Freeze, and its boundaries are not related to Hopi or Navajo use in 1934. Further, the 1980 codification of the Freeze, 25 U.S.C. § 640d–9(f), was intended to preserve the parties' rights subject to a final adjudication. Thus, this Court will not adopt the boundaries of the Moenkopi Administrative Unit as the Hopi exclusive use boundary.

The Court will instead adopt a boundary for the Village of Moenkopi based on 1934 aerial photographs. (See, Exs. C and D to the Navajo brief on standards for partition and delineation of boundaries, based on Exs. 728 and 731). The photographs demonstrate that there were Hopi improvements north of the present Highway 264, including a water tank and stone quarry at Site 134. The exclusive use boundary will follow from Site 134 to the east along the 4800–foot contour line to Reservoir Canyon. To the west, the exclusive use boundary will follow from Site 134 in a straight line to the northeastern corner of the Navajo allotments. The eastern boundary of the Village of Moenkopi is contiguous with that of Reservoir Canyon and need not be established; the southern boundary of the Village is contiguous with the Hopi allotments and Hopi fields in the Kerley Valley/Moenkopi Wash area (which will be included in the Hopi exclusive use area) and also need not be established.

There is evidence that some area within the present-day Moenkopi Administrative Unit was jointly used by Navajos and Hopis in 1934, and the area within the Moenkopi Administrative Unit (outside of the Village of Moenkopi) outside the Hopi exclusive use area will be treated as a joint use area.

### 2. Reservoir Canyon

The Court found that Reservoir Canyon, lying northeast of the Village of Moenkopi, was exclusively used by Hopis in 1934, but did not define the boundaries of the canyon. (4/27/92 Findings, pp. 24–25).

In the preceding section, the Court found that the boundary of Moenkopi Village followed from Site 134 along the 4800 foot contour to Reservoir Canyon. The western boundary for Reservoir Canyon will continue up the 4800 foot contour up to the present Highway 160, the northern boundary will be Highway 160, and the eastern boundary will travel south from Highway 160 along the 4800 foot contour on the other side of Reservoir Canyon until it connects with the northern boundary of the Hopi allotments.

### 3. Moenkopi Wash/Kerley Valley

The Court found that the Hopi exclusive area in the Moenkopi Wash/Kerley Valley area included areas upstream from the present Highway 264 bridge, downstream from the present Highway 264 bridge (except for Navajo patented allotments) and south of the Wash between Moenkopi and the "old Hopi bridge" at the western end of Kerley Valley. (4/27/92 Findings, pp. 16–21).

The northern border for the area east of the Highway 264 bridge (upstream) will be the center of Moenkopi Wash, extending to Adams Site 152 on the east. West of the Highway 264 bridge, the exclusive use boundary will travel with Highway 264 until the highway meets the Hopi allotments. This encompasses fields 11 and 12, east of the Hopi allotments, which the Court found were exclusive Hopi farming areas. The exclusive area will also include fields 12.11 and 12.8, immediately west of the Hopi allotments, southwest of the Village of Moenkopi. All Hopi allotments, including Tract 43 adjacent to the Navajo allotments, will be included in land partitioned to the Hopi Tribe. The exclusive area does not include the small area of land between the Navajo allotments and the "Government Farm" west of Moenkopi.

South of Moenkopi Wash and west of the Village, the Hopi exclusive area in Kerley Valley will extend from the bluff west of the Navajo allotments (immediately west of present-day Site 45, belonging to the Goldtooth family) at field 3.1 to the western border of field 3.8. The northern boundary will be the center of the Wash, and the southern boundary will be the cliffs of the Moenkopi Plateau (the 4600–foot contour line). This excludes the site of the present-day Tuba City Sewage Lagoons, where the Court found that a Navajo camp had resided in 1934. (4/27/92 Findings, p. 49, n. 89).

### 4. The Moenkopi Plateau

The Court found that certain areas on the Moenkopi Plateau were within the Hopi exclusive area, including an area south and southeast of Moenkopi (south of the Wash) and the central/southern Moenkopi Plateau to the southern border of the claimed Hopi exclusive use area, marked on Exhibit 703A [7]. (4/27/92 Findings, pp. 55–58, 63–64.)

The Court finds that the western boundary of the exclusive use area will descend from the southwestern corner of the Hopi allotments and follow the boundary proposed by the Navajo Nation. This boundary accurately reflects where Navajos lived and herded

on the northwestern Plateau and along the western escarpment of the Moenkopi Plateau in 1934.

The eastern boundary of the Hopi exclusive area will begin at Adams Site 152, follow the drainage of Ironwood Springs onto the Plateau, and proceed south to the Adams line, excluding the Bakalo (Hollow Place) and Little Bakalo (Little Hollow Place). The areas for Hollow Place and Little Hollow Place shown on the Navajo Nation's map (Ex. A to its brief re: standards for partition and delineation of boundaries) will be adopted by the Court.

### Conclusion

The total acreage of the Hopi exclusive area is approximately 22,675 acres.

### B. Hopi and Navajo Joint Use Area

This Court found that a number of areas were jointly used by Hopis and Navajos in 1934: (1) Moenkopi Wash/Kerley Valley north of the Wash between the Government Farm on the east and the old Hopi bridge on the west, (2) Pasture Canyon, (3) north of the Moenkopi Wash and east of the Village of Moenkopi, (4) the western Moekopi Plateau, (5) the northeastern Moenkopi Plateau, (6) Ward Terrace, (7) the Bakalo (Hollow Place), (8) Coal Mine Mesa, and (9) the southern Moenkopi Plateau. (4/27/92 Findings, p. 79). Each of these areas was more specifically delineated in the April, 1992 Findings of Fact, but need further definition.

### 1. Moenkopi Wash/Kerley Valley north of the Wash between the Government Farm on the east and the old Hopi bridge on the west

This Court found that the area north of the Moenkopi Wash between the Government Farm and the "old Hopi bridge" was jointly used by Navajos and Hopis in 1934. (4/27/92 Findings, p. 29–30). The joint use area excludes the Government Farm, in which the Court found the Hopi Tribe did not have an

---

**7.** Exhibit 703A was prepared by Hopi expert Dr. Adams to portray his opinion of the Hopi exclu-

sive use area.

interest. (Findings, pp. 29–30). Only the northern boundary requires elucidation.

The farming plots north of the old Tuba City–Cameron Road are below the ridge or bluff to the north at the 4600–foot contour line, and the northern boundary will be set at the 4600–foot contour, extending from Kerley's Trading Post to a north-south line immediately west of field 1.10.

The joint use area does not extend west of field 1.10. Only two farm plots were located west of field 1.10 (field 1.8 and 1.9), both of which the Court found were farmed by Navajos. Further, the joint use area will not extend north of the 4600–foot contour to pick up field 1.6e, which was farmed by Navajos in 1934.[8]

As discussed previously, the area within the Moenkopi Administrative Unit north of the Hopi exclusive use area and south of Highway 160 was also jointly used by Hopis and Navajos in 1934.

### 2. *Pasture Canyon*

■ The Court found that only Hopis farmed in Pasture Canyon in 1934, that two Hopi outfits grazed their livestock in Pasture Canyon, and that Navajos were grazing in and around Pasture Canyon. (4/27/92 Findings, pp. 25, 39–43).

The Hopi Tribe argues that the joint use area should include a "reasonable" area surrounding the canyon floor, and suggests a margin of one and one-half miles from the bottom of the drainage on all sides. However, the Court found no evidence that Hopis grazed outside of the Canyon in 1934. Further, the Hopi Tribe did not establish an interest in the "Government Pasture" in Pasture Canyon. Accordingly, the joint use area will be restricted to Pasture Canyon south of the Government Pasture.

### 3. *North of Moenkopi Wash and east of the Village of Moenkopi*

The April, 1992 Findings did not specify the eastern or northern boundaries for this joint use area. The Court found that east of Moenkopi, Hopis primarily grazed east and southeast of Moenkopi and Navajos primarily grazed east and northeast of Moenkopi; however, there was evidence of Hopi sites *north* of Moenkopi Wash (Adams Site 108 and 109). (Findings, p. 63–64).[9]

The western boundary of this joint use area is contiguous with the eastern boundary of the Hopi exclusive use area in the Village of Moenkopi/Reservoir Canyon areas, previously defined. The northern boundary will start from the point at which Highway 160 divides Reservoir and Pasture Canyons, and travel in a slightly northeasterly direction to pass directly north of Adams Site 108 and 109. The northern boundary will then curve in a southeast direction when it reaches a point north of Adams Site 152, until the boundary crosses the Moenkopi Wash at Adams Site 157, just west of "Standing Big Tree".

### 4. *Northeastern Moenkopi Plateau*

The Court found that the northeastern Moenkopi Plateau was jointly used by Navajos and Hopis in 1934. (4/27/92 Findings pp. 47–54). East of the Hopi exclusive use area, the joint use area boundary will follow the Moenkopi Wash to a point directly north of Rock Pile windmill. This represents a reasonable grazing area for the Hopis located at Adams Site 157, the easternmost Hopi site in 1934. There is no evidence of substantial Hopi use east of this area to support a further extension of the joint use area. The evidence cited by the Court at notes 85 and 115 places Hopis well within the boundary

---

**8.** The April, 1992 Findings classify *areas* as joint or exclusive use, rather than individual plots; otherwise, small islands of Hopi and Navajo exclusive interest would result, which under the statute would become a part of each respective reservation. However, some of these areas may have been overinclusive. In this circumstance, since fields 1.8, 1.9, and 1.6e were found to be farmed by Navajos and are at the border of the joint use area, an island of Navajo use will not result, and these fields will be excluded from the joint use area.

**9.** The Court also found that Hopis did not graze their livestock north of Moenkopi Wash to Red Lake, Middle Mesa, and Wildcat Peak, and stated, "Hopis did not graze their livestock north of Moenkopi Wash (except in Pasture Canyon, as previously discussed)." (Finding, p. 64–65). This latter finding was not meant to contradict the previous finding that Hopis grazed their livestock at Sites 108 and 109 north of the Wash.

outlined above. The Hopis did not present any physical evidence of Hopi use east of Adams Site 157, and no government document mentioned Hopi grazing east of the boundary outlined.

### 5. Western Moenkopi Plateau

The Court found that the western Moenkopi Plateau was jointly used by Navajos and Hopis in 1934. (4/27/92 Findings pp. 47–54). The western boundary of the joint use area (except where it is extended by Ward Terrace) follows the western escarpment of the Moenkopi Plateau at the 4900-foot contour.

### 6. Ward Terrace

The Court found that both Navajos and Hopis grazed their livestock on Ward Terrace in 1934. (4/27/92 Findings, pp. 43–47). In the Amended Findings, the Court clarified that this did not encompass the entire Ward Terrace geographic feature, but instead, that the southern boundary of the Ward Terrace joint use area was parallel with the southern boundary for Ward Terrace depicted on Ex. 703A (south of "Waawala" and "Spring on the Rocks"). The western boundary will travel southwest from the old Hopi bridge to the Five Mile Wash, and travel directly south to the southern boundary of the Ward Terrace use area.

### 7. The Bakalo (Hollow Place)

The Court found that both Navajos and Hopis used the Hollow Place in 1934. (4/27/92 Findings, p. 58). Because this area merges with the joint use area on Coal Mine Mesa and is bounded on the west by the Hopi exclusive use area, there is no need to discuss the boundaries for Hollow Place.

### 8. Coal Mine Mesa

The Court found that Navajos and Hopis jointly used portions of Coal Mine Mesa in 1934. (4/27/92 Findings, pp. 59–62). The western border of this joint use area is defined by the Hopi exclusive area (in the northern section) and by Appaloosa Ridge (travelling from the southeastern corner of the Hopi exclusive use area to the southern fence of the Buck Pasture).

The eastern boundary of the Coal Mine Mesa joint use area will begin at a point at Moenkopi Wash east of Adams Site 157 and

directly north of Rock Pile windmill (as previously discussed). The joint use boundary will then travel in a straight line southeast to "Tsorspatuyqa", follow the edge of Coal Mine Canyon until it reaches "Coal Mine", and then head directly south until the southern boundary at Hukvahklo (Windy Tank) is met. (This southern boundary will be established in the next section).

This excludes Coal Mine Canyon, for which there was little evidence of Hopi use. The area includes the points at which the SCS recorded Hopi grazing (see 4/27/92 Findings, footnote 116), and includes Little Hollow Place. Although the Court initially found that Hopis did not use Little Hollow Place in 1934 (see 4/27/92 Findings, pp. 58–59), upon reexamination of the evidence it is clear that testimony referring to use on Coal Mine Mesa included Little Hollow Place. See, 4/27/92 Findings at note 116.

### 9. Southern Moenkopi Plateau

Finally, this Court concluded that the southern Moenkopi Plateau was a joint use area, south of the Hopi exclusive area border depicted on Ex. 703A, throughout Buck Pasture to Hukvahklo (Windy Tank). (4/27/92 Findings, pp. 55–58). Further, in Amended Findings issued on June 18, 1992, the Court clarified that the joint use area on the Moenkopi Plateau did not extend past Windy Tank. (Amended Findings, p. 5).

The joint use area is bounded on the north by the previously defined Hopi exclusive area; the southern, eastern and western boundaries must be defined. The escarpment of the Moenkopi Plateau forms the western border (except where it adjoins the joint use area on Ward Terrace). The eastern boundary follows straight south from the "Coal Mine" to Windy Tank, and does not meet the border of the 1882 Reservation (as previously discussed in the Coal Mine Mesa section). The southern boundary extends from the western escarpment south of the southern Buck Pasture fence (at the Adeii Eechii Cliffs) to the eastern boundary.

### Conclusion

The acreage of the joint use area is approximately 167,819 acres. The acreage of the "checkerboard lands" on the southern

Moenkopi Plateau which this Court previously found were excluded from Hopi claims, must be subtracted from the acreage of the joint use area. The Court finds that Ex. 5571 best estimates the location of these checkerboard lands if they are eventually surveyed; the total acreage to be excluded is 14,976. Thus, the total acreage of the joint use area available for partition is 152,843 acres.

## FINDINGS OF FACT

### I. Current Hopi Use

■ A number of Hopis testified regarding their grazing and farming areas, including Jonathan Phillips,[10] Wilfred Kaye,[11] Wil-

10. *Jonathan Phillips*, age 44, is presently a representative from Moenkopi to the Hopi Tribal Council. 1 TT 75. He testified that he has about 85 mature cattle and 15 horses. 1 TT 76, 78. He testified that his grazing permit authorizes 100 sheep units ("SUs"), plus 5 horses, 1 TT 77, and Phillips agreed on cross-examination that he has three times the amount of livestock authorized by his permit. 1 TT 117.

Phillips explained that Harry Goldtooth, the grazing committeeman, did not show up to count his stock. 1 TT 118. Further, Phillips contended that a previous grazing committeeman, Mark Begay, had told him that the BIA permit was invalid, and a permit issued by the Hopi Tribe allowed him 200 head of cattle. 1 TT 128. This was not confirmed, and he admitted on cross-examination that no other grazing committeeman had told him that the BIA grazing permits were invalid. 1 TT 125–126.

Phillips testified that he keeps most of his horses on the range with his cattle, although he keeps a couple of horses at a community corral, east of Moenkopi. 1 TT 78–79.

The central location for his cattle herd is in Little Hollow Place. Phillips has two corrals in Little Hollow Place (Site 2 on Ex. 4417); a large corral (east of the windmill) was built in 1955–1956 next to the stone house his grandfather Roger Honahni had built in the 1930's, 1 TT 81–83; a smaller corral is located next to a trailer he brought into the area in 1982. 1 TT 82–84. He goes out to Little Hollow Place four days a week to tend his herd, and stays in this trailer overnight when necessary. 1 TT 85. His family does not stay with him there. 1 TT 118–119. He rounds up the cattle about every two weeks. 1 TT 119.

Phillips testified that his stock mainly waters in Little Hollow Place at Windmill ∂ 3A–27, referred to as the "Honahni Windmill". The Navajo Nation maintains the windmill, and he does minor repairs. 1 TT 79–80. The cattle graze in different areas, rotated on seasonal basis in spring, early fall, and winter to avoid overgrazing. 1 TT 94–95. Phillips outlined this grazing area on Ex. 4420. 1 TT 100. He testified that cattle can graze four to five miles from a corral in one day. 1 TT 131.

In the fall, Phillips testified that his cattle graze toward the northern Buck Pasture fence to the windmill at Goldtooth. They also graze up the Lazy Ranch (Site 1, owned by William Numkena and his outfit) north of Buck Pasture, to the western escarpment of the Moenkopi Plateau, and north up the escarpment to the sand dunes southwest of Hollow Place. His cattle also graze east from the Goldtooth windmill to a ridge east of the Hollow Place, although he tries to keep the cattle out of this area. 1 TT 86–89.

Phillips testified that in the winter, his cattle range from the Little Cowboy windmill at the northeast corner of Buck Pasture, around the Buck Pasture fence south of Buck Pasture to "Where the Hills End" windmill and the Salt Water windmill. He stated that at this time of year the cattle are centered around the Little Cowboy windmill, and graze north to Highway 264, east to the 1882 Reservation border, and west to the Hollow Place and to the sand dunes west of the Hollow Place. 1 TT 89–92.

In the spring, Phillips' cattle graze in the area around Little Hollow Place, north to the elbow of Highway 264 below Alvin Honyumptewa's corral (Site 5), east to the rodeo grounds on Coal Mine Mesa, south to the Goldtooth and Little Cowboy windmills, and west to the Lazy Ranch. 1 TT 92–94.

The Court finds that these grazing areas are overstated; although Phillips may find strays at the far reaches of this area (for instance, south of the Buck Pasture), his herd of 85 cattle could not have intensively used this entire area.

Phillips also testified that his cousin, Pierson Honahni, and Pierson's outfit use Phillips' corrals, and that they graze their herds together. 1 TT 84–85.

Phillips testified that Navajos·also graze in this area. 1 TT 94–95. Haskey Littleman lives on the northern rim of Little Hollow Place (Site 58), and waters his stock at Little Hollow Place. 1 TT 122–23. Phillips testified that other Navajos haul water from Little Hollow Place, including Frank Whiterock (Site 56), Tony Billy (Site 75A), Gee Flatrock (Site 57), and Howard Begay (Site 79), but do not graze in the Little Hollow Place. 1 TT 127. Phillips also testified that Navajos water at the Little Cowboy windmill, including Kahn Yellowhair and Roger Begay, and at the "Where the Hills End" windmill and the "Salt Water" windmill, including the Nez boys and Railey Begay. 1 TT 124. Jonathan Phillips is also a farmer, and planted two fields this year. 1 TT 100. The first farm is in Kerley Valley, within the Moenkopi Administrative Area, and the second field is by the Moenkopi bridge, off Highway 264. 1 TT 100. The witness outlined these farming areas on Ex. 4421.

Phillips testified that a number of other Hopis farm in Kerley Valley in the immediate vicinity of his first field, including Conrad Tewa, Eugene Kaye, Loren and David Phillips, and Wayne Dallas, among others (fields # 1–# 4 on Ex. 4421).

Phillips drew a line around the area farmed by Hopis in this area on Ex. 4421. 1 TT 106–108.

Phillips' second field is east of the Moenkopi Administrative Area (labelled # 6 on Ex. 4421). A number of other Hopis farm in this area, as well: Russell Gaseoma, Martin and Catherine Gashiwiseoma, Gerald Lomatewama, Allen Nuvayestewa, Franklin Howard, Van and Emerson Burton, Reggie Curry, John Sewiltima, Luther Honeyestewa, Willard Holmes, and Elliot Seletstewa (labelled # 7–# 15 on Ex. 4421). 1 TT 106–108. Phillips testified that no Navajos farm west of the Highway 264 bridge up to the Hopi allotments. 1 TT 113.

Jonathan Phillips also has a field in Hollow Place north of Highway 264, although it was planted by George Honahni this year. 1 TT 113–114. (This field is outlined in blue cross-hatch on Ex. 4417).

11. *Wilfred Kaye*, age 33, also testified regarding his ranching and farming activities. Although Kaye lives in Hotevilla on the Hopi Reservation with his family (and has active religious responsibilities as the kachina chief), Kaye has a ranch house in Hollow Place, at which he spends approximately 80% of his time when his sons attend school in Moenkopi. 1 TT 132–136.

Kaye began ranching in 1982 after he left the Navy; at that time, he was helping his father who lived at the ranch in Hollow Place. His father died in 1986, and had lived in Hollow Place for about twelve years. 1 TT 139–40.

Kaye's ranch house and corral are just north of the elbow of Highway 264 (Site 8). Kaye also testified that he also utilizes a second corral belonging to Elliot Seletstewa, located 4–5 miles east of Kaye's ranch house. 1 TT 144–45. Elliot Seletstewa's corral is actually north of Kaye's ranch, at Site 6. 2 TT 301–02 (Robert Charley). Kaye testified that he keeps about 25 cattle (including young) in the first corral, and 30–35 cattle (including young) in the second corral. In total, Kaye looks after 35 mature cattle and four horses; this includes his cattle, his brother Wilmer's cattle, and Wesley Honahni's cattle. Kaye's permit allows 132 SUs, including four horses. 1 TT 143.

Dr. Russell, the Navajos' expert witness, compiled a list of Hopi livestock holdings and permit allowances from the 1991 BIA grazing records. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Wilfred Kaye permitted 132 SUs; in 1991, he had 32 cattle, and 2 horses, for a total of 138 SUs).

Kaye testified that in the summer, he hauls water every other day to the cattle in the first corral; these cattle also obtain water from Ironwood Springs and Moenkopi Wash (from the point at which the fields are fenced, east to the "Falls"). 1 TT 148–150.

The cattle around the second corral water along Moenkopi Wash from the "Falls" area up to the confluence of the Wash and Coal Mine Canyon (to the east of Moenkopi), at the windmill north of Moenkopi Wash (northeast of Lice Hill), and at the windmill below the bridge south of wash. The witness identified these water sources on Ex. 4417. 1 TT 153. He testified

that the cattle do not graze around Ironwood Springs from the second corral. 1 TT 182.

Kaye drew a red line around the area grazed by his cattle on Ex. 4422. 1 TT 154. On cross-examination, he testified that his cattle generally do not graze southeast of Coal Mine windmill, as Navajos drive them back, and that generally upon round-up, he usually only finds 5 of his cattle here. Further, he testified that he usually finds only 3–4 of his cattle by the windmill north of Lice Hill. 1 TT 180–81.

Kaye also testified that he has four horses, three of which graze on top of Coal Mine Mesa, north of Highway 264. Kaye drew a line around the area in which they graze, marked "H" on Ex. 4422. He keeps one horse with him for work purposes. 1 TT 166–67. His father had ten to twelve horses when he died; these horses grazed in the same area. Wilfred Kaye plans to buy two registered quarter horses for breeding, and testified that he will keep them in the same area. 1 TT 168.

Kaye testified that other Hopis graze in the same area. 1 TT 157–166, 183. Kaye herds with Bennie Tewa (his grandfather), who has about 50 cattle. *But see*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Bennie Tewa permitted 65 SUs; in 1991 he had 17 cattle, for a total of 68 SUs). Kaye's and Tewa's cattle usually graze in same area. Kaye drew a line around Tewa's grazing area on Ex. 4422, labelled "BT". 1 TT 155. Leroy Hungeva confirmed that Kaye and Bennie Tewa graze east and north of Highway 264. 2 TT 257–58. Further, Ralph Jackson has 2 cattle which graze with Kaye's cattle. *See*, Ex. 5606 (Dr. Russell summary of Hopi livestock holdings) (Ralph Jackson permitted 81 SUs; in 1991, had 3 cattle, for a total of 12 SUs). Loren Phillips and another Hopi have about 45 mature cattle which graze together along the Wash, between Whitehorse windmill and Coal Mine windmill, into Hollow Place, and to Ironwood Springs. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Lorenzo Phillips, Loren's father, permitted 165 SUs; in 1991, had 27 cattle, for a total of 108 SUs). Kaye also testified that Mark Taho has about 100 cattle, which graze north of the wash around Lice Hill, south of the Wash to Whitehorse windmill, and east into Coal Mine Canyon. *But see*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Mark Taho permitted only 15 SUs, and is not listed with any livestock in 1991). Later evidence revealed that Mark Taho's wife, Blanche Taho, a Navajo, owned all of the livestock. 8 TT 1241–44, 1285–86 (Faye Tso).

Kaye also testified that Navajos use some of these grazing areas: the Zahne family lives on the eastern edge of his grazing area, waters its sheep at Whitehorse windmill, and grazes its cattle in the area in which Kaye grazes his horses, south of the Coal Mine windmill. 1 TT 180–81, 184–85. Further, the Begays graze their cattle around the Coal Mine windmill. 1 TT 182.

Finally, in connection with his religious responsibilities as kachina chief at Hotevilla, Wilfred Kaye collects small amounts of different colored sand for sand painting, flowers, and duu-

liam Numkena,[12] Leroy Hungeva,[13] Robert

ma (clay) for the kachina dancers. He also collected a certain type of reed for his fiancee's bridal suitcase before his marriage (as do all Hopi men prior to getting married). The areas in which the witness collected these materials was marked on Ex. 4424. Kaye testified that there are no other areas in which these materials can be found, except that the required reeds can be gathered south of Table Top Mesa (not within the jointly used area). Kaye also testified that the Sparrow Clan obtained an eagle for an upcoming ceremony in the area marked "E", along Moenkopi Wash, that clan's regular eagle-gathering area. 1 TT 170–175, 187–88. Wilfred Kaye also carves kachina sculptures from cottonwood tree roots he collects along the Wash. 1 TT 176.

12. *William Numkena*, now 75 years old, testified that he is still active in farming and grazing livestock. (Numkena also testified in Phase I of this case; his previous testimony appears at 6 TT 928–991 of the first trial.) His livestock operations are centered at the "Lazy Ranch" on the Moenkopi Plateau (Site 1), a ranch built in 1938 by he, Raymond Nasetoynewa, James Humetewa, Bryan Gilbert, and Wilson Kaye. There is a corral, hay barn and house at the ranch, and the present members of the "outfit", including Raymond Nasetoynewa, Jr., Melvin Puyouma, and Jimmy Gail Honahni, graze their cattle together. 1 TT 193–96. The members stay overnight at the ranch in the summer once in awhile before roundup, and use the site for meals. 1 TT 196.

Numkena testified that he owns about 30 cattle, 20 of which are mature. He estimated that the outfit, as a whole, owns about 130 cattle. 1 TT 196. (This total amount conflicted with his estimation of cattle held individually by each outfit member; he estimated that Raymond Nasetoynewa, Jr. owned about 30 cattle, that Jimmy Gail Honahni owned about 15, and that Melvin Puyouma owned about 8 cattle. 2 TT 221–22.) Numkena's grazing permit allows 64 sheep units. 2 TT 220–21. See, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (William Numkena permitted 64 SUs, and in 1991, he had 33 cattle, for a total of 132 SUs; Ray Nasetoynewa permitted 53 SUs, and in 1991, had 22 cattle, for a total of 88 SUs; Melvin Puyouma permitted 35 SUs, and in 1991 had 14 cattle, for a total of 56 SUs; no information given regarding Jimmy Gail Honahni).

The outfit rounds up their cattle once a month, sometimes twice a month, and checks on cattle between round-ups about 3 times per week in the winter. 1 TT 197–98, 223. He checks up on his cattle less in the summer when he is busy with his fields. 2 TT 223. Numkena testified that the outfit's cattle water at the windmill by his corral, the windmill in Little Hollow Place, at a catch basin in Big Hollow after rain, by Alvin Honyumptewa's corral (Site 5), south to Goldtooth windmill, at the four springs on the western escarpment of the Moenkopi Plateau. 1 TT 198–99. The cattle grazed between these water sources. 1 TT 199. Numkena outlined this area on Ex. 4423. 2 TT 206. His cattle do not go inside the Buck Pasture. 2 TT 206.

Numkena testified that other Hopis, including the Honahni brothers and Jonathan Phillips use the same range, and that Alvin Honyumptewa sometimes uses the northern part of the grazing area. 2 TT 207, 225–26.

Further, Numkena testified that Navajos use this area: Jim Lefthand's daughters, Irene Manygoats and Arlene Begay (who live at Sites 54 and 53, respectively), use the Goldtooth windmill, the windmill at the Lazy Ranch, and the springs on the west rim of the Moenkopi Plateau; he did not see them north of Spring on the Rocks. 2 TT 207–08, 227–30, 240. Henry Billy, who lives at Site 83, grazes his cattle southwest of the Little Cowboy windmill and around the Goldtooth windmill, but not at the Lazy Ranch windmill or the west rim of the Moenkopi Plateau. 2 TT 207–08, 232–33. He testified that no one lives at the Goldtooth ranch now, and that the Goldtooths grazed north of Buck Pasture only once when windmill was broken about three years ago. 2 TT 208–09. He testified that these Navajos have not interfered with the use of his grazing areas. 2 TT 233.

William Numkena farms, as well. One field is in Kerley Valley, as represented on Ex. 4424. He first started working this field when he was a young boy, and his nephews now help farm the field. This year, he planted corn, beans, melon (typical crops for dry fields); he also has apricot and peach trees. Kerley Valley is irrigated (though not frequently) by an irrigation ditch traveling down the length of Kerley Valley from Moenkopi Wash. 2 TT 210–213. Numkena goes to his fields every day during the growing season to pull weeds and check on plants. He stores his crops for his own consumption. 2 TT 213.

Numkena has another field in Pasture Canyon, above the Pasture Canyon Reservoir and below the area that used to be the "Government Pasture"; he marked the location of this field on Ex. 4425. 2 TT 214–215. He testified that some of the land in this area is too wet to be farmed, but that all of the remaining land is farmed. 2 TT 216. During the growing season he visits the field every day; this year he planted sweet corn, chilies, tomatoes, and string beans (crops possible only with irrigation). 2 TT 217. His son helps him with this field. 2 TT 218.

Numkena further testified that Navajos farm above the Hopi farms, in the "Government Pasture". 2 TT 214–215. The Government Pasture fence is still present, which forms a boundary between the Navajo and Hopi farms. 2 TT 233. Water for the Hopi fields first comes through the Navajo farming area in an irrigation ditch; Numkena testified that this ditch has been there since he was young and has been maintained by Hopis every year. When he was young, the ditch was maintained as a community effort in early spring; now, every farmer must maintain his portion of the ditch. 2 TT 217–219. He testified that Navajos have not interfered with the water in Pasture Canyon. 2 TT 234.

13. *Leroy Hungeva*, age 39, testified that he has been a full-time farmer and rancher since 1985. 2 TT 247. He presently has 13 breeding cows, 5

yearlings, 2 bulls, and one horse for which his sister Lucille Walker cares for in Peach Springs. The cattle belong to him, his sister, and his brother. He testified that his grazing permit allows 103 sheep units, plus 4 horses. 2 TT 247-249. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Ethel Hungeva (Leroy's mother), permitted 123 SUs; in 1991, he had 22 cattle, for a total of 88 SUs).

Hungeva has a corral, a cinder block house, a small trailer and a water tank at a site in the Hollow Place, north of Highway 264. (Site 7). He sleeps at the trailer (brought to this site in the early 1980's) when branding or if some of his cows are in trouble, and occasionally cooks meals there. The cinder block house, built in 1983, is unused because the walls are cracking. 2 TT 250-252.

Hungeva hauls water for his cattle every day in summer and every three days in winter. The cattle graze around the corral, and occasionally graze to Coal Mine Mesa windmill for water if he doesn't haul water to them. Hungeva marked this grazing area on Ex. 4426, and a larger grazing area to the north used by his father in the 1960's. 2 TT 253-255.

He testified on cross that he tries to keep his cattle in Hollow Place. 2 TT 269-70.

Hungeva also testified that Dennis Tewa grazes his cattle just north of Hungeva, and marked his grazing area on Ex. 4426. Hungeva testified that Tewa has about 50 mature cattle (though has never counted), and that he sees Tewa's cattle when taking water to his own. 2 TT 259-60, 271-72. *But see*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Dennis Tewa permitted 35 SUS, and in 1991, had 10 cattle for a total of 40 SUs). He also testified that Loren Phillips has about 30 cattle. 2 TT 273. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Lorenzo Phillips permitted 165 SUs; in 1991, Phillips had 27 cattle, for a total of 108 SUs). Further, Hungeva testified that Mark Taho grazes his cattle east and north of Highway 264, and marked the location of Taho's corral north of Moenkopi Wash on Ex. 4426. 2 TT 261-62.

Hungeva testified on cross that he sees Navajo cattle on the fringes of Hollow Place, and that the strays water at his trough. Although he doesn't know the names of the Navajos who own these cattle, he knows Karen Dallas, a Navajo who lives part-time on the east side of Hollow Place. 2 TT 274-75.

Hungeva's family has four fields; one is below lower Moenkopi Village in the Hopi allotment area, two are in Pasture Canyon, and one is in Hollow Place. The field in Hollow Place is about 100 yards south of his corral; the last time it was planted was in the mid-1970's, although the field is still fenced and is used for pasturing horses and injured cows. 2 TT 263-64. The fields in Pasture Canyon are planted every year. He marked the location of these fields on Ex. 4427. 2 TT 265-66. As the allotted lands are outside the scope of this litigation, no evidence was presented about the field in the allotment area.

14. *Robert Charley*, age 38, grew up in Moenkopi and returned in 1978 after time in the service and college at *Northern Arizona University.* 2 TT 282. He cares for his mother's 18 cattle; the grazing permit allows 25 cattle. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (no listing for Robert or Phyllis Charley). He checks the cattle every week, and rounds up the cattle about four times per year during calving and branding. 2 TT 282-86, 308, 311.

Charley's corral is west of windmill 3K-325 (Site # 4). This corral was built in the late 1980's; he has had a corral in about five other places in the past. 2 TT 311-12. His cattle water at windmill 3K-325, at springs near Tonali, Toh Nee Di Kishi, Spring on the Rock, at the Lazy Ranch windmill, at the Little Hollow Place windmill, and in Hollow Place after a rain. At times, Charley has also found some of his cattle near the Goldtooth windmill, and the Little Cowboy windmill (though these appear to be strays). 2 TT 286-92, 296-97, 315-16. Charley marked the area in which his cattle graze on Ex. 4428, though he tries to keep them in the northern half of this area. 2 TT 294-96. The Court finds that this grazing area is larger than 18 cattle could regularly graze. He tries to keep them away from Moenkopi Wash and often finds them in Hollow Place. 2 TT 314.

Alvin Honyumptewa also grazes his livestock in the northern part of the area. Honyumptewa, who Charley testified owns about 65 cattle (including calves), keeps them at a corral at Site 5. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Alvin Honyumptewa permitted 65 SUs; in 1991, he had 22 cattle and 1 horse, for a total of 93 SUs).

Honyumptewa and Charley's father were once partners, and Charley and Honyumptewa have worked together on range improvements, such as maintenance and improvement of the springs on the western edge of Moenkopi escarpment. 2 TT 298-300, 309-10.

Charley also testified that Elliot Seletstewa has a corral just southeast of the Village of Moenkopi (Site 6). Although he doesn't know how many livestock Seletstewa has, he testified that Seletstewa's cattle graze around the corral and in the same area as Charley's cattle. 2 TT 301-02. *See*, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) ("Eli Seletstewa" permitted 37 SUs; in 1991, he had 33 cattle for a total of 132 SUs).

Charley also testified that Navajos use the area, as well, watering their livestock at the Lazy Ranch, Little Cowboy, and Goldtooth windmills. 2 TT 316-17.

Charley's family has three fields: one in Pasture Canyon, another in Kerley Valley (north of the diversion dam), and the last on the south side of the Wash in Kerley Valley.

In Pasture Canyon, the field is located in the Hopi field area between the reservoir and old Government Pasture. Charley marked the Kerley Valley fields on Ex. 4429; the field south of

Honahni,[16] Alton Honahni, Sr.,[17] Clayton

the Wash belonged to his grandfather, Talawepi, and has not been planted since his death in the early 1970's. The field north of the diversion dam belongs to his brother Lester, and is still planted. 2 TT 302–04.

**15.** *Gilbert Naseyowma*, 58 years old, also testified regarding his grazing and farming areas. Gilbert Naseyowma began raising cattle in 1955–57, working with Elliot Seletstewa's father, Robert Charley's father, Alvin Honyumptewa, Bennie Tewa, and Logan Luma. Although he lived in other areas during the 1960's and 1970's, he returned to Moenkopi full time about six years ago and began acquiring cattle about 2 years ago. He now works with Elliot Seletstewa and Willard Holmes. 2 TT 321–26.

He testified that he has 8 cows and 2 horses, Elliot Seletstewa has about 25–30 cattle and one horse, and Willard Holmes has about 18 cows, and no horses. 2 TT 327. His grazing permit allows 163 sheep units, plus 5 horses; both Elliot Seletstewa and Willard Holmes have grazing permits, though he does not know how many sheep units they are permitted. 2 TT 341–42. *See,* Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (does not list holdings of Gilbert Naseyowma; "Eli Seletstewa" is permitted 37 SUs, and in 1991 had 33 cattle for a total of 132 SUs; Willard Holmes is permitted 15 SUs, and in 1991 had 10 cattle, for a total of 40 SUs).

Naseyowma is a long-distance runner and checks on his cattle on the weekends by running to their grazing areas; the outfit rounds up the cattle weekly to keep the cattle away from the fields in Moenkopi Wash. 2 TT 328. The livestock graze from the corral at on the Moenkopi Plateau on the west side of Highway 264 (Site 6). 2 TT 321–23. The outfit hauls water to the corral during the summer; the cattle also water at three springs just south of Moenkopi Wash, at a spring just north of the corral, and at the Wash when it is running. The cattle also graze to the springs at Tuutsiva (Toh Nee Di Kishi) and Tsinngava (Tonali) on the escarpment, and the windmill by Sites 4 and 5. 2 TT 329–331, 343–45. Naseyowma marked his grazing area on Ex. 4431. 2 TT 332–34.

Naseyowma testified that other Hopis use this grazing area, as well, including Robert Charley and Alvin Honyumptewa. 2 TT 335. Further, he has seen Navajo livestock grazing on the northwestern rim of Moenkopi Plateau. 2 TT 325.

Gilbert Naseyowma has 5 fields. One field is to the east of Moenkopi, ½ mile above Ironwood Springs, which was not planted this year due to rain damage. The other fields are in Kerley Valley, and were outlined on Ex. 4431. The most western field, south of the Wash (labelled # 1 on Ex. 4431) is presently planted and is irrigated from the Wash; during planting, Naseyowma goes to the field every other day, but now goes only on weekends. Field # 2 and # 3 are irrigated from the Hopi Reservoir and are presently planted. Field # 4 has been plowed, but

not planted this year, since Naseyowma is building a house there. 2 TT 335–39.

**16.** *Pierson Honahni* testified that his family owns 30–35 adult cattle and 2 horses; he personally owns 8 of the cattle. He admitted that the family's permit allows only 41 sheep units. 2 TT 351–53, 365. See, Ex. 5606 (Dr. Russell's summary of Hopi livestock holdings) (Stanley Honahni (Pierson's father) permitted 41 SUs; livestock not counted in 1991). Although he is presently employed by the BIA as a heavy equipment operator, Pierson Honahni and his sister Alice usually care for the cattle. 2 TT 351–53. Their corral is in Little Hollow Place (Site 3), located by a now-unused rock house built 40 years ago by his grandfather Roger Honahni, father Stanley Honahni, and others of the "Lazy Ranch" outfit. Honahni brought a trailer onto the site about 10–15 years ago. Others use the corral, including Jonathan Phillips and the Lazy Ranch outfit. 2 TT 354–56, 365–66.

Honahni checks on the cattle twice a month, and conducts a complete round-up 4–5 times per year. 2 TT 355. His cattle most frequently water at the windmill in Little Hollow (next to his corral), the Lazy Ranch windmill (Site 1), and Goldtooth windmill, although they also occasionally use Little Cowboy windmill and Spring on the Rock. Further, when it rains, water gathers south of Highway 264 in Hollow Place. 2 TT 357–58. Honahni marked his grazing area on Ex. 4433. Jonathan Phillips, and the Lazy Ranch outfit also use this area. 2 TT 360–61, 365–67.

Honahni also testified that Navajos use this area: Haskey Littleman lives between Hollow Place and Little Hollow Place and waters his livestock at Little Hollow Place and at Little Cowboy windmill. Tony Billy and Henry Billy water their cattle at Little Hollow, and Helen George waters her livestock at Little Cowboy. Further, two Navajo families live south of the Lazy Ranch (Manygoats and Begay), and water their livestock at Goldtooth windmill. 2 TT 367–70.

Honahni testified that he has two fields: one in Hollow Place north of Highway 264 (a dry farm which has been planted every year), and a second in Kerley Valley (which is planted every year). Honahni marked the Kerley Valley field on Ex. 4434. 2 TT 361–63. Honahni testified that he has problems with Navajo cattle in his field in Hollow Place every year. 2 TT 371.

**17.** *Alton Honahni, Sr.*, age 66 (who also testified in the first trial) is presently governor of Moenkopi; this is the third time he has been elected governor, and has served in a variety of other capacities for the Hopi Tribe. 2 TT 375–77.

Honahni has 35–40 mature cattle and 6 horses. He has grazed his cattle and horses on the Hopi Partitioned Lands since 1986; before 1986 he grazed in Little Hollow Place with Roger and Stanley Honahni and Jonathan Phillips, and by

Honyumptewa,[18] and Eugene Kaye.[19] Many of these people testified about the grazing and farming practices of other Hopis, as well.

Most of the Hopis living in the 1934 Reservation live in the Village of Moenkopi or within the Moenkopi Administrative Unit. Some of the Hopis have dwellings east of Moenkopi adjacent to farming areas,[20] and some ranchers have "ranch houses" in which they stay briefly when caring for their livestock. These ranching sites are depicted on Ex. 4417.

■ The Hopi grazing area is centered on the central Moenkopi Plateau, around Little Hollow Place, Hollow Place, and along the western escarpment of the Plateau. Less intensive Hopi grazing occurs on the northwestern section of the Moenkopi Plateau, on southern Coal Mine Mesa, and on the northeastern section of the Moenkopi Plateau. Outside of occasional strays, no Hopi grazing occurs south of the Buck Pasture, in Coal Mine Canyon, or north of Moenkopi Wash. No Hopis graze inside the Buck Pasture or on Ward Terrace. Most of the area intensively grazed by Hopi livestock will be partitioned to the Hopi Tribe.

■ The water sources most intensively used by Hopis for grazing include the "Lefthand" (or "Lazy Ranch") windmill, Goldtooth windmill, Little Hollow Place windmill, the springs on the western escarpment of the Moenkopi Plateau (including Spring on the Rocks, View Point Well, Seller Springs, Tonali and Toh Nee Di Kishi), the Owl Head windmill and Ironwood Springs. Fewer Hopi livestock use the Little Cowboy windmill, Coal Mine windmill, Rock Pile windmill, Whitehorse windmill, and the Moenkopi Wash.[21] Only strays use the water sources south of the Buck Pasture, including "Where the Hills End" windmill and Salt Water windmill, neither of which are within the 1934 joint use area, in any event. Most of the water sources intensively used by Hopi livestock will be partitioned to the Hopi Tribe.

Hopis primarily farm in Pasture Canyon (south of the old "Government Pasture"), and in the Moenkopi Wash/Kerley Valley area south of Moenkopi Wash. There are Hopi farms north of the wash in the vicinity of the Village of Moenkopi within the Hopi exclusive use area, and a few Hopi farms north of

the confluence of Moenkopi Wash and Coal Mine Canyon for a short while. 2 TT 387–90.

Honahni has three fields: one field is used by his nephew George Honahni at Hollow Place, another is west of Moenkopi, and the third field is east of Moenkopi by Moenkopi Spring. Honahni marked the location of these last two fields on Ex. 4436. All three of these fields have been farmed for the past 35 years. 2 TT 391.

18. *Clayton Honyumptewa*, age 36, testified that his family farms east of the Village below Highway 264, and by the Moenkopi Administrative Unit. The family also has a dry farm in Hollow Place, although it has not been planted since his father died 1 and ½ years ago. 2 TT 406–08.

19. *Eugene Kaye*, age 60, returned to Moenkopi in 1982 when he retired from a career with the Indian Health Service, and is now a councilman from Upper Moenkopi to the Hopi Tribal Council. 3 TT 441–42, 454. He farms four fields in Kerley Valley and Pasture Canyon. The first field is located towards the "old bridge" in Kerley Valley north of the Wash, the second is southwest from the village within the Moenkopi Administrative Unit, the third is east of the Village in the Moenkopi Spring area, and the fourth is in Pasture Canyon. He confirmed that his farms in Kerley Valley were accurately represented on Ex. 4437, and his Pasture Canyon field on Ex. 4438. 3 TT 442–43.

He has been farming the field in western Kerley Valley for about four years; prior to this time, it was farmed by Elliot Seletstewa. 3 TT 459–60. Kaye testified that Steven Albert also farms in the area north of the Wash, although he did not know whether Albert planted this year. 3 TT 444–45, 461. The area between he and Steven Albert is farmed by a Navajo. 3 TT 459–60. Kaye has received little production from this dry farm.

He has personally farmed the field in Pasture Canyon since 1982, though his family worked the field before this date. He showed the approximate location of the southern fence of the old Government Pasture where the Navajo fields begin, north of the Hopi field area. 3 TT 446–48. He testified that he and Allen Nuvayestewa farm the most northern Hopi farms in Pasture Canyon; the Government Pasture runs along the north side of the field.

20. Willard Holmes, Elliot Seletstewa, Charlene Holmes, Lenora Cordero's son, Franklin Howard and his daughters, Joseph and Edna Tallas, and Howard Lomatawayma have homesites east of Moenkopi. Willard Holmes, Franklin Howard, Joseph and Edna Tallas, and Howard Lomatawayma also have homes in Moenkopi. 3 TT 431–36, 439 (Honyumptewa).

21. The Little Cowboy and Whitehorse windmills are outside of the 1934 joint use area and not subject to partition to the Hopis.

the Wash in western Kerley Valley. Also, there are a few Hopi farms in Hollow Place. Clayton Honyumptewa, Director for the Office of Hopi Lands of the Hopi Tribe, created two maps showing all Hopis farming in Kerley Valley and Pasture Canyon. *See,* Ex. 4437 (Kerley Valley); Ex. 4438 (Pasture Canyon). He prepared these maps from records kept by his office in the last three years for purposes of this litigation, and by interviewing Hopis in these areas over the last 2–3 months. 2 TT 400–01, 408–12 (Honyumptewa).

## II. *Current Navajo Use*

Navajos also testified about their residence, farming and grazing in the 1934 joint use area, including Ale Manygoats,[22] Edward Begay,[23] Julia Hadley,[24] Alice Edison,[25] Hel-

22. *Ale Manygoats,* 67 years old, has lived on the Moenkopi Plateau at Sites 53 and 54 for 42 years. He first lived at Site 53, when he married Arlene Lefthand (now Arlene Begay). After they divorced around 1956, Ale married Arlene's sister Irene, and they have since resided at Site 54. Arlene remarried, and still lives at Site 53 full-time with her husband Arthur Begay. 6 TT 910–14.

Arlene and Irene's mother, Alice Lefthand, now about 96 years old, lives in Tuba City, and Irene goes to Tuba to care for her and occasionally stays overnight. Ale also stays overnight in Tuba City sometimes, but returns home every day to care for his sheep and cattle. Manygoats testified that his son, Amos Manygoats, and Amos' family also live at Site 54, although when he is working, he sometimes stays at a job site. 6 TT 916–18.

Dr. Scott Russell, the Navajos' expert anthropologist, confirmed that Ale and Irene Manygoats live at Site 54, that Arlene and Arthur Begay live at Site 53. Dr. Russell testified that the Lefthands moved into the area in 1936–37 because they are listed in the 1940 grazing records. 4 TT 584–88. *But see,* Ex. 5565A (Dr. Russell's resident and principal user list) (does not list Amos Manygoats as a resident or principal user of Site 54).

Manygoats testified that he has 6 horses, about 5 mature cattle, 10 sheep and 6 goats, which are cared for by he and his son. Dr. Russell testified that Irene Manygoats is permitted 63 SUs, and in 1991, had 15 sheep and goats, 7 cattle, and 3 horses, for a total of 58 SUs. 4 TT 584–88.

Dr. Russell compiled a list of Navajo livestock from BIA grazing records in 1991, 1990, 1989, and 1968. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same).

Manygoats testified that his cattle graze in a 3 mile radius from his home, to the "Lefthand" (or Lazy Ranch) windmill, to the springs on the western escarpment of the Moenkopi Plateau (including Seller Spring), to Wolf Point and to the Goldtooth Ranch. 6 TT 918–21. However, at deposition he testified that his cattle don't often graze north of his homesite (including to Lefthand windmill and Wolf Point), due to Hopi cattle to the north. 6 TT 925–26. The sheep mainly graze to the western escarpment of the Plateau, as far as Seller Springs. 6 TT 921–22.

Manygoats also testified that Arlene and Arthur Begay have 8–9 cattle, which graze in the same area and use the same water sources as his cattle. 6 TT 922–23. Dr. Russell testified that Arlene Begay was permitted 69 SUs, and in 1991 had 4 sheep and goats, 4 cattle and 2 horses, for a total of 30 SUs. 4 TT 584–88. *See also,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same).

Finally, Manygoats testified that he has fields at his homesite, and that Arlene and Arthur also have fields at their site. These fields are planted every year. 6 TT 923.

23. *Edward Begay,* 57 years old, lives in Tuba City with his wife Roberta. 6 TT 930. He retired after 36 years as a Home Living Assistant with the BIA boarding schools. 6 TT 947, 949–50.

Begay testified he owns about 14–16 adult cattle and 5 horses, and·has a grazing permit which allows 75 sheep units. His daughter Judy Secody owns 6 adult cattle, and has a grazing permit which allows 40 sheep units. They herd with Edward's sister Gloria Hadley, Ramona Kaye Jim, and Don Davis. Begay testified that Ramona Jim has 20 adult cattle and 5–6 horses, though did not know how many sheep units are authorized on her grazing permit. Don Davis cares for 5 cattle belonging to his wife, Eula Davis (Gloria Hadley's daughter); Gloria Hadley's grazing permit allows 24–25 cattle. 6 TT 931–34, 947. See Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Edward Begay and his daughter permitted 120 SUs, and in 1991 had 14 cattle and 3 horses, for a total of 71 SUs; Ramona Jim is permitted 70 SUs, and in 1991 had 23 cattle and 5 horses, for a total of 117 SUs; Gloria Hadley permitted 219 SUs, and in 1991 had 7 cattle, for a total of 28 SUs). *See also,* 4 TT 537–42, 550–51 (Dr. Russell) (same).

Begay testified that he has two corrals; one just north of Coal Mine windmill (Site 59), and the other close to Rock Pile windmill (Site 62B). At Site 62B, he has a small house with a shade, in which he stays overnight every week, sometimes for two weeks at a time. Ceremonials are sometimes held here. 6 TT 934–37. Begay testified that the corral at Site 59 was built around 1948, and is still used. There are three houses at this site, none of which are currently occupied. 5 TT 937–41. Dr. Russell confirmed the use of the corrals at Sites 59 and 62B. 4 TT 537–42, 550–51.

Begay checks his cattle every day, and in the summer turns the water on every day at the Coal Mine Mesa windmill. His cattle graze between the Coal Mine Mesa windmill and the Rock Pile windmill, one mile southwest of Rock Pile to where Gee Flatrock lives (Site 57), and north of Rock Pile windmill along the Coal Mine Canyon

above Site 64B. 6 TT 941–43. He also testified that Ramona Jim's horses graze in the same area, and also to White Horse windmill. 6 TT 945. Julia Hadley testified that Edward Begay's grazing area often overlaps hers, in the same area. 6 TT 980.

Begay also testified that he has a 4–5 acre dry farm west of Coal Mine windmill at Site 62A. He has planted this field for about 10 years, and plants it every year. 6 TT 945–46.

24. *Julia Hadley*, 43 years old, has lived on Coal Mine Mesa at Site 61 since 1953. Her husband Dan Hadley, Jr. is a painter for the Tuba City School District; she is not presently employed. They and their six children live part-time in a trailer at Site 61, behind the rock house belonging to her late father, Herbert Zahne. Her husband also has a house in Tuba City, and she and the children live at both places, spending the majority of weekends and summers at Coal Mine.

Growing up, she lived near Site 61 in a hogan about 1 and ½ miles away, until the rock house was built at Site 61 in 1953–54. Her three brothers, Harrison, Norman, and Herbert, Jr., now live in the rock house. Harrison and Herbert, Jr. live at Site 61 full-time, and Norman stays with his stepchildren in Tuba City when he goes to the hospital. 6 TT 954–63. Dr. Russell confirmed that Julia Hadley and Norman Zahne live at Site 61. 4 TT 547–50.

Hadley's sister Sadie has a house at Site 64. Although she also has a house in Tuba City, Julia Hadley testified that Sadie spends 1–2 nights a week at Site 64, and comes out every day to tend the cattle. 6 TT 977–79. Dr. Russell testified that Site 64 is unoccupied. 4 TT 554–55.

Hadley also testified that Sadie's son, Glenmore Begay, lives at Site 60. Her father Herbert Zahne used a hogan at this site until his death seven years ago; the Hopi Tribe mistakenly tore down the hogan after his death, and later gave permission for Glenmore Begay to rebuild at that site.

He built a new hogan during the past two years. 6 TT 971–74. Glenmore's wife is a high school history teacher in Pinon, and lives at the school during the school year, coming back to Coal Mine on the weekends and summers. Glenmore has also been a substitute teacher occasionally. Glenmore spends about 3 days a week at the site. 6 TT 974–77, 988–90. Dr. Russell confirmed that Glenmore Begay and his family live at Site 60. 4 TT 543–47.

Julia Hadley testified that she grazes her livestock along with her sister Sadie, Glenmore Begay, Joe Bedonie (her brother-in-law), Joann Old Crow (Joe's daughter), and her brothers Norman and Herbert, Jr. Hadley testified that she has 12 cows and that the total herd is about 30 mature cattle. She also has 3 horses, Norman has 5–6 horses, Joe has 2 horses, Joann has 1 horse; 10 of these graze on the open range with the cattle. 6 TT 964–66. Glenmore Begay sells and buys horses for a business, and has between 9 and 22 horses at any one time. 6 TT 971–74. She, Sadie, Joann, Joe, and Glenmore have grazing permits. 6 TT 979. *See,* Ex. 5603 (Dr. Russell's

summary of Navajo livestock holdings) (Julia Hadley permitted 100 SUs, and in 1991 had 21 cows and 3 horses for a total of 99 SUs; Sadie Zahne Yazzie is permitted 40 SUs, and is listed as having 22 cows and 2 horses, for a total of 98 SUs; Joe Bedonie is permitted 47 SUs, and in 1991 had 8 cows and 3 horses for a total of 47 SUs; Glenmore Begay is permitted 25 SUs, and in 1991 had 10 cattle and 13 horses, for a total of 105 SUs). The group thus appears to have less livestock in 1992 than it did in 1992. *See also,* 4 TT 543–47, 547–50, 554–55 (Dr. Russell) (same).

Hadley testified that the outfit has a number of corrals: the cattle corral at Site 61B was built in the early 1960's (though another was in same vicinity before it was built), there is a sheep and horse corral next to the house at Site 61, and Glenmore has a corral in Coal Mine Canyon. 6 TT 966–67. She testified that the livestock graze past the Rock Pile windmill, past Site 64B (her sister Sadie's cornfield) and Site 64 (Sadie's house), and along the north side of Highway 264, and occasionally to Coal Mine windmill. 6 TT 968–70, 980. Glenmore grazes his horses against the canyon between the rodeo ground and the 1882 fence, north of Highway 264. 6 TT 977.

The family has one farm field near their house. Although they had two fields in Coal Mine Canyon, the road caved in 2–3 years ago and the fields are thus inaccessible. None of the fields have been farmed recently since her brother Norman became sick. 6 TT 970–71.

25. *Alice Edison*, age 48, was born on Coal Mine Mesa to Henry and Yazzie Billy. She, her husband, and children have a house at Site 63, although she sometimes stays in Tuba City at her sister-in-law's house with her children during the school year. Her mother is in a nursing home in Flagstaff, and her father lives on Coal Mine Mesa until it gets cold, at which point he moves to Tuba City to live with his daughter. 6 TT 992–97. Dr. Russell testified that Yazzie Billy was in a rest home, that Henry Billy travelled back and forth to Tuba City, and was not sure how much time Alice Edison spent at Site 63. 4 TT 551–54.

Edison testified that she has 10 sheep, 15 goats, 2 horses, and 4 cattle. Dr. Russell testified that in 1991, she had only 2 sheep and 4 goats. 6 TT 999–1002. *See also,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Alice Edison permitted 100 SUs in 1991). She explained that they had to sell much of their livestock three years ago to help with her mother and father's health problems, and that although they were counted as only having 6 sheep and goats in 1991, they have acquired more animals since then. 6 TT 999–1002.

Edison's husband cares for the sheep every day; she helps care for them when she is at the site. Their sheep and cattle water at Little Cowboy, Little Hollow Place, and Goldtooth windmills. The cattle graze north of the site about 3 miles, but normally go southeast of the house to Appaloosa Ridge. 6 TT 999–1002, 1005–06. She testified that she sometimes sees Hopi cattle grazing around this area. 6 TT 1006.

Alice Edison has fields at her home, and her father has one within the Buck Pasture; it ap-

en George,[26] Evelyn Flatrock,[27] Edith Billy,[28]

pears neither of the fields were planted this year. 6 TT 1002–03, 1006.

**26.** *Helen George,* 43 years old, has been an elementary school teacher at the Tuba City Boarding School for 21 years. She has lived at Site 77 on Coal Mine Mesa for 25 years, and commutes the 18 miles into Tuba City every day during the school year. Her mother, brother, older daughter, son-in-law and grandchild live with her at Site 77. Another son and daughter live at Site 77 part-time; her son is in the military, and her younger daughter goes to school in Flagstaff. There are three hogans, a ramada, and a sheep and horse corral at Site 77. 6 TT 1010–12. Dr. Russell confirmed that George and her family live at this site. 4 TT 566–67.

George testified that she owns 18 sheep and goats, no cattle, and 1 horse. 6 TT 1013–14. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (George permitted 15 SUs, and in 1991 had 18 sheep and goats and 1 horse, for a total of 23 SUs in 1991); *see also,* 4 TT 566–67 (Dr. Russell) (same).

During the summer, she and her brother take turns caring for the sheep; during the winter, her brother cares for them. 6 TT 1012–13. The sheep graze west and south in a three-mile radius around Site 77, south to Little Cowboy windmill, to Coal Mine windmill if Little Cowboy is not working, and west to Little Hollow Place if those are not working. 6 TT 1013–14.

George testified that she is related to Lillie Walker, who lives ½ mile south at Site 86. Lillie and Loren Walker have lived there full-time for about 29 years, and have no other residences. George testified that the Walkers have a cinderblock house, a ramada, a sheep and cattle corral, an earth hogan, and a corn field which was planted this year. The Walkers have 20 adult sheep and goats, 5 adult cattle, and 3 adult horses. They water their livestock at the same windmills her stock use. 6 TT 1015–18, 1020–21.

*See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Loren Walker permitted 60 SUs, and in 1991 had 20 sheep and goats, 6 cattle, and 6 horses, for a total of 74 SUs).

**27.** *Evelyn Flatrock,* age 60, testified that she and her husband Gee Flatrock have lived full-time at Site 57 for about 30 years. Their daughters Loretta and Jean also live at Site 57 full-time, and their daughter Angela returns every two weeks from her job in Albuquerque. Flatrock testified that there is a house at the site (built 25 years ago), as well as a hogan, ramada, horse corral, pig corral, and a garage. 6 TT 1023–26. Dr. Russell confirmed that the Flatrocks live at Site 57. 4 TT 531–33.

Flatrock testified that they have 12 cows (with 10 calves), 1 bull, and 3 horses, and that her husband Gee's permit allows 60 sheep units. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Gee Flatrock permitted 62 SUs; had 16 cattle and 4 horses in 1991, for a total of 84 SUs); 4 TT 531–33 (Dr. Russell) (Flatrocks had 14 cows and 4 horses in 1991).

She helps tend the livestock, and the cattle graze to the east, west and north about 2 miles, and water at Coal Mine windmill and Rock Pile windmill. If these windmills are not working, they must haul water from Tuba. The cattle do not graze to the south, since Highway 264 is less than one mile away. 6 TT 1027–29. She testified at her deposition that she has seen Hopi livestock at the Coal Mine and Rock Pile windmills. 6 TT 1030.

Flatrock planted a field next to their home this year. 6 TT 1029.

**28.** *Edith Billy,* 65 years old, is married to Tony Billy (a son of Henry and Yazzie Billy). When she married at age 19, she lived at Site 75B, 1 and ½ miles away from Henry and Yazzie (who were at Site 63); she and Tony Billy still use a cattle corral at Site 75B. 20 years ago, Edith Billy and her family moved to Site 75 next to the highway, where the family had a summer sheep camp, so that the children could catch the school bus. There are two houses at Site 75 (one owned by their daughter Maybelle), a ceremonial hogan, a horse corral and a hay barn. Edith has nine children; Corinna and Herman live at Site 75 full-time, and the other children store their belongings at the site because they do not have their own homes. 7 TT 1038–45.

Billy testified that she and her husband have 5 mature cattle, 2 horses, and 13 sheep, and that their permit allows 100 sheep units. She also testified that Maybelle has 12 sheep (including lambs), 7 goats, and 1 cow, and that Maybelle's permit allows 50 sheep units. 7 TT 1045–47. Dr. Russell testified that in 1991, Edith and Tony Billy had 6 sheep, 9 goats, 4 cows and 3 horses, for a total of 46 SUs.

*See also,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; Tony Billy permitted 120 SUs; Maybelle's stock not included in the summary).

Their animals graze together, and she, Tony, her son, and the grandchildren care for them; Maybelle cares for her stock every Sunday when she returns. The sheep water in Little Hollow Place, and in Hollow Place when it rains, and graze between Site 75 and these places. The cattle water at the Goldtooth and Little Cowboy windmills, and graze south of Site 75B. 7 TT 1045–50. Her livestock stay south of Highway 264. 7 TT 1067. She has seen Hopi cattle in the same area. 7 TT 1063.

Billy also testified that she has a field at Kerley Valley, which used to belong to her father; the field was planted this year. She is also an herbalist, and gathers medicinal plants. 7 TT 1050–51.

Edith Billy also testified about Frank Whiterock, Haskey Littleman, and Howard Begay. Frank Whiterock lives next to her at Site 56, and has lived there for a very long time. She testified that the Whiterocks own cattle, sheep and horses, although Edith did not know how many they own. 7 TT 1051–55. Dr. Russell testified that Frank Whiterock is permitted only 15 SUS, and had 3 horses, no cattle and no sheep in 1991. 4 TT 528–31. *See also,* Ex. 5603 (Dr. Russell's

Sally Yazzie,[29] Alfred Hosteenez,[30] Angela

summary of Navajo livestock holdings) (same). Billy testified that Whiterock's livestock waters in Little Hollow Place, and grazes in Hollow Place and Little Hollow Place. Frank and his wife Marlene have a home in Tuba City, where Marlene is caring for her grandmother. Edith sees Frank at the site "all the time", and everyone in the Whiterock family is there once a week on Sunday. 7 TT 1051–55.

Billy also testified that Haskey Littleman lives full-time at Site 58. Haskey owns cattle, which graze from Hollow Place to Little Hollow Place, in the same area Edith grazes her sheep. Haskey has a field at his home, which he planted this year. 6 TT 1055–57. Dr. Russell testified that Haskey Littleman is permitted 52 SUs, and had a total of 31 SUs in 1991. 4 TT 533–37; see also, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (4 cattle and 3 horses in 1991).

Finally, Billy testified that Howard Begay lives at Site 79. Begay and his wife built a house at Site 79 before the Billy's house was built. He owns sheep and cows; Billy has seen him with 2 cows, and about 100 sheep. Billy testified that Begay waters his sheep at Little Hollow Place, and grazes north of Little Hollow, and in the same area Edith Billy grazes her sheep. 7 TT 1058–60. Dr. Russell testified that Howard Begay and his sister, Anna Begay Nez, had 61 sheep, 9 goats, and 1 horse in 1991, for a total of 75 SUs. 4 TT 568–69. See, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; permitted 75 SUs).

**29.** *Sally Yazzie,* 58 years old, testified that she lives full-time at Site 71 on Coal Mine Mesa south of Highway 264. She has lived in that house about 20–25 years, and her daughters Ida and Monica live there with her. There is also a hogan at the site, where she sometimes stays in the winter. Before moving to Site 71, she lived one mile north for over 40 years. 7 TT 1068–70, 1072–73. She testified that her son Loredo and his family also live at Site 71 full-time, in another house. 7 TT 1071. A third house at Site 71 belongs to her daughter Vida Hatatli; Vida and her husband return every Friday to the house, where they stay on weekends. 7 TT 1072. There are also three corrals at the site. 7 TT 1073–74.

Sally Yazzie also testified that she owns structures at Site 71 (diamond), including a hogan and a small house with a ramada. Until four years ago, she used to spend winters at this site. Although she testified that other people are now living there, there was no evidence regarding who lived at Site 71 (diamond), and it was classified as a non-residential structure by the Navajo Nation. 7 TT 1075–76.

Yazzie testified that her children have livestock, including 50 sheep, 10 goats, and about 20 cattle. Dr. Russell testified that in 1991, the Yazzies had only 11 sheep and 15 goats, for a total of 26 SUs. 4 TT 559–61. See, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; permitted 70 SUs). No information was given regarding Loredo Yazzie's cattle holdings.

Yazzie testified that the sheep and goats water at Little Cowboy windmill (as they have been doing for 50 years). The family hauls water if necessary. Every day, she turns the water on at the Little Cowboy windmill for her son's cattle. 7 TT 1076–78.

Sally's mother, Sylvia Riggs, lived at Site 72, northwest of Site 71. Three weeks before trial, Sylvia moved to a nursing home, but before then was living with her children, rotating between their homes. Sally's sisters Evelyn and Jean still live at Site 72 full-time with their children. 7 TT 1078–83, 1091–93. Dr. Russell testified that in 1991, Sylvia Riggs had 9 cows and 6 horses, for a total of 66 SUs. 4 TT 561–62. See, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; permitted 32 SUs). There was no evidence presented whether Evelyn and Jean now have these livestock since their mother moved to a nursing home.

Sally Yazzie also testified that her cousin, Anna Nez Begay, has lived at Site 74 about 40 years. Anna's children now live in Tuba City, and Anna cares for three of her sons with health problems there. Yazzie testified that Anna still comes out to Site 74 every day, and sometimes stays overnight. As discussed previously, Anna Begay Nez and her brother Howard Begay had 61 sheep, 9 goats, and 1 horse in 1991. 4 TT 568–69 (Dr. Russell). Anna waters her sheep at Little Cowboy windmill, and sometimes hauls water. 7 TT 1083–86.

Sally Yazzie's younger brother, Kenneth Lee Begay, lives at Site 76 with his wife and grandchild. Kenneth also has a home in Tuba City where he works, and he sometimes stays overnight there. Kenneth's daughter Lavonne Begay lives at Site 76 with her husband and 3 children. Yazzie also testified that Kenneth has cattle, which she sees at Little Cowboy windmill every afternoon, though she does not know how many he has. 7 TT 1086–90. Dr. Russell testified that Kenneth had 9 cows and 2 horses in 1991, for a total of 46 SUs. 4 TT 565–66. See, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; permitted 40 SUs).

**30.** *Alfred Hosteenez,* 80 years old, lives with his wife at Site 80 on Coal Mine Mesa. Five years ago, he moved to Site 80 from a location very near Site 78, where Dewey Zahne presently lives. Alfred's son Benson and his family live in the same house as Alfred and his wife. Alfred's daughter Marie and her family live part-time in a hogan at Site 80; they have another house in Provo, Utah, for which they received relocation benefits, which they are now renting. Marie also has trailer in Tuba City which functions as a fabric store, and at which she and her family sometimes stay overnight. 7 TT 1097–1102.

Hosteenez testified that he, his wife, and children have livestock which graze together. He has 70 cattle and horses (mature and young) which graze at a place called "Beginning of the Flow" down in Coal Mine Canyon, where they water at streams and small ponds in the canyon. His stock also water at "White horse pulls the

Rose Maloney,[31] Bennie Begay,[32] Kay Yaz- zie,[33] Eleanor Williams,[34] Lena Canyon,[35] Ed-

wagon" (or Whitehorse windmill) when there is no water in Coal Mine Canyon, but he herds them back into the canyon. He has a corral at Site 80, and two down in the Canyon (Sites 80B and 80C). Since the livestock must cross Highway 264 to get to Coal Mine Canyon from his homesite, he transports them to the corrals in Coal Mine Canyon. 7 TT 1103–07. He also has 40 sheep and goats (mature and young), which graze behind his home to Little Cowboy windmill; occasionally he takes the sheep to Little Hollow Place when there is no water at Little Cowboy. 7 TT 1107–08. Dr. Russell testified that in 1991, Hosteenez had 6 sheep, 10 goats, 39 cattle and 7 horses. 4 TT 569–73. *See*, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same, for a total of 207 SUs in 1991; Hosteenez permitted 120 SUs).

**31.** *Angela Rose Maloney*, 42 years old, lives east of the Pasture Canyon Reservoir at Site 110. She has a graduate degree in Public Health Administration, and works at the Tuba City Hospital environmental health department; her husband works for Peabody Coal Company. Angela has lived at Site 110 since 1966, when her parents moved to the site. 7 TT 1112–14.

There are a number of structures at Site 110, including her mother's house, her house, 2 hogans, 2 ramadas, 4 storage sheds, 3 corrals, 1 garage, and a trailer. A number of people live at the site full-time: she, her husband, their five children, their oldest son's girlfriend and their son's two children live in her house; her mother, her two brothers, a sister-in-law, and four children live in her mother's house. Maloney's sister Mary Paslakai and her family, who have a home in Cameron, come to the site daily, and stay once a week at the Maloney's home. 7 TT 114–15. Unlike most Navajo sites seen in this trial, Site 110 has electricity and a septic system which the Maloneys obtained before the Bennett Freeze went into effect. 7 TT 1130.

Maloney also testified regarding nearby sites in the Pasture Canyon area: Elliot Long lives full-time at Site 104; the Johnsons have lived at Site 98 full-time since 1966; Helen Drake and Katherine Tohannie have owned Site 108 since 1966, but now rent the site; Rachel Sanchez and her family have lived full-time at Site 100 since 1966; Betty Farrell has owned the house at Site 95 since 1966, but now rents the house; Mina Dallas has owned the house at Site 134 since 1966, and now rents it to the Alcotts, who live there full-time; Tom Tohannie and his mother Lola Bilagody live at Site 97, mostly in the summer; and the Woody family lives at Site 89 full-time. She did not know who lives at Site 91, 96 or 101. 7 TT 1115–21.

Angela Maloney testified that she and her family have 80 sheep and goats and 5 horses, which they keep on the homesite. Dr. Russell did not provide information regarding Maloney's livestock. They graze on both sides of Pasture Canyon, and in the Canyon to Pasture Canyon Reservoir, where there are streams coming from the reservoir, and on both sides of the Reservoir.

The Yazzie family, Elliot Long, and the Johnsons also water their livestock at the reservoir. 7 TT 1122–24.

**32.** *Bennie Begay*, 56 years old, lives at Site 7 on Coal Mine Mesa. He is married to Eta Begay, and has 7 children. He is a contractor, but is not currently working. He also has a home in Kerley Valley at Site 7A, at which they stay during the school year. Bennie returns to the site on Coal Mine every week during the school year. Bennie grew up on Coal Mine, and lived 1 and ½ miles away until 1959, when the house at Site 7 was built. 7 TT 1132–34.

His younger brother, Kee Begay, and Kee's family also live at Site 7, as does Bennie's older sister Chee Begay Tohannie, his younger brother Tony Begay, nephew Woody Begay, niece Irene McCabe, and Tony's in-laws, Sally and Harold McCabe. 7 TT 1134–37. Kee, Chee and Sally McCabe also spend time at Tuba City. 7 TT 1142–45.

Bennie Begay testified that he keeps his livestock at Site 7, which graze with livestock belonging to Tony, Kee, Woody and Irene. Begay testified that in total, they have 50 mature sheep, over 50 mature cattle, and 12 horses. Begay testified that his grazing permit allows 113 sheep units, Woody has over 100 sheep units on his grazing permit, and Chee Tohannie has about 50 on her permit. 7 TT 136–37. *See*, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Bennie Begay, Joe Begay and Chee Tohannie permitted 163 SUs; in 1991, they had 12 sheep and goats, 26 cattle, and 5 horses for a total of 141 SUs. No information was provided regarding Woody Begay).

Bennie Begay testified that the livestock grazes east to the 1882 Reservation border fence, south to "Salty" windmill and Where the Hills End windmill, and to the Little Cowboy windmill. The livestock used to use the Bennie Begay windmill and the 3T–540 windmill, but they are out of order. 7 TT 1138–39. The livestock also grazes in Buck Pasture unit #2 in the winter; he received permission to graze in Buck Pasture from the chapter house since his paternal grandfather, Flatrock, grazed there before fence was built. It is Bennie's understanding that Flatrock and others with customary use areas in the Buck Pasture had agreed to "lend" the Buck Pasture to the BIA for 30 years, and that it would be given back to his family if it was no longer used by the BIA. Begay has a corral in the Buck Pasture, at Site 7D. 7 TT 1139–40.

**33.** *Kay Yazzie*, 70 years old, lives with his wife Nina at Site 55 on Coal Mine Mesa near "White Horse Pulls the Wagon", or Whitehorse windmill. Kay also has a home in Tuba City which he bought with relocation benefits; Kay has medical problems and must see the doctor in Tuba City. Kay moved to the 1934 Reservation when he was relocated from Rough Canyon in the Hopi Parti-

tioned Lands about 10 years ago; Kay testified that his wife's family had rights to the area around Site 55. Kay's son Kee lives at Site 55 full-time, and cares for the sheep. 8 TT 1154–58.

They have livestock, including about 23 goats, 16 sheep, and 5 horses. Dr. Russell testified that Kay Yazzie had 62 SUs in 1991. 4 TT 525–28. *See also*, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Kay Yazzie permitted 30 SUs; in 1991, had 37 sheep and goats and 5 horses). Kee cares for the animals, though Kay sometimes helps. The sheep water at the Whitehorse windmill, and graze toward the "rock cliffs" (presumably Coal Mine Canyon). 8 TT 1161–62.

Kay also testified that he has two fields close to his home at Site 55, which he has been planting every year since he moved to this site. 8 TT 1160.

34. *Eleanor Williams*, 36 years old, moved to Site 121 on Coal Mine Mesa in 1986 with her husband Donald Williams and their seven children. The site was formerly a summer camp for Donald's family. From 1983–86, they lived at Site 78 with Donald's family; they moved from the HPL in 1983 after living there for one year. 8 TT 1166, 1173–74. Eleanor Williams is a Navajo language instructor in the Tuba City public schools; they had rented a home in Tuba City until recently, but now live full-time at Site 121. 8 TT 1174–75. The Williams have a mobile home, storage shed, horse corral and sweat bath at Site 121. 8 TT 1176.

Eleanor's father, Dewey Zahne, lives full-time at Site 78. He has lived in this area for a very long time, and had lived a few hundred yards east of Site 78 when Eleanor was born. Eleanor's brother Lawrence also lived at Site 78, but is now in the military. 8 TT 1166–68. There is a frame house, hogan, storage shed and ramada at this site. Her father plants a corn field to the north. 8 TT 1170.

Donald's parents, Nelson and Sally Williams, used to live at Site 69; Sally now lives in Tuba City. Goerge and Archie Williams, Donald's brothers, continue to live at Site 69. 8 TT 1170–71.

Her father Dewey Zahne did have livestock, but he got rid of them and gave his grazing permit authorizing 50 sheep units to Eleanor. 8 TT 1168–70. Nelson Williams transferred his grazing permit for 60 sheep units to Donald Williams; she and Donald took over Nelson's cattle about 10 years ago. 8 TT 1172–73. They now have 17 mature cattle, and 3 horses. Dr. Russell testified that the Eleanor and Don Williams had 16 cattle and 1 horse in 1991, for a total of 69 SUs, and that Sally Williams had 11 sheep and 15 goats in 1991, for a total of 26 SUs. 4 TT 555–58. *See*, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Don Williams permitted 60 SUs, had 7 cattle and 1 horse, or 33 SUs, in 1991; Eleanor Williams permitted 50 SUs, had 9 cattle, or 36 SUs, in 1991; Sally Williams permitted 70 SUs). Dr.

Russell confirmed that Dewey Zahne transferred his permit to his daughter and now has no livestock. 4 TT 567–68. Presumably, George and Archie Williams continue to care for Sally Williams' livestock.

The cattle water at the Little Cowboy windmill, and at Little Hollow Place, Goldtooth windmill, Where the Hills End, and the Salt Water windmills if there is not enough water at Little Cowboy. The cattle also graze inside the Buck pasture in the winter, near the Little Cowboy windmill. 8 TT 1177–78. She has also seen Hopi cattle in Little Hollow Place. .8 TT 1178.

35. *Lena Canyon*, 76 years old, is the daughter of Frank Goldtooth, who had extensive ranching operations in 1934. They first moved from Goldtooth Ranch on the Moenkopi Plateau (Site 120, diamond) to Kerley Valley in 1953. Lena and her husband Jefferson Canyon live at Site 45, and the Goldtooth family now occupies a number of other sites immediately north of Moenkopi Wash. 8 TT 1193–95. Ex. 5602 (Kerley Valley site map) (Site 30, 32, 33, 36, 37, 38, 39, 40, 42, and 45). *See also*, 5 TT 623–28 (Dr. Russell).

Lena Canyon farms a field on the south side of the Wash, which she began planting in 1956 and has planted every year. 8 TT 1193–95. She also owns a number of hogans and other structures south of the Wash, which now have ceremonial functions. The first hogan south of the Wash was built in 1956 as a residence for her mother. 8 TT 1196–97. The Goldtooths also farm a number of fields north of the Wash by their residences. 8 TT 1211–13. The fields north and south of the Wash are watered from the Wash when there is water. 8 TT 1211–13.

The fields west of the ceremonial hogans are farmed by Hopis. The bluff area between Lena Canyon's hogans and the Hopi fields has never been farmed. 8 TT 1197–98.

Lena now owns about 20 sheep and goats. She has leg problems and cannot herd the sheep, but her son and husband take the sheep out every day, taking turns with the fields and sheep. They herd the sheep to the top of Plateau, and water the sheep at Crater Well. They have been herding in this area since 1953. 8 TT 1198–1200. She owns three corrals on the Moenkopi Plateau (Sites 45, diamond, 45G, and 45I) and two hogans on the Moenkopi Plateau (Site 45, diamond) in which a herder can spend the night if he or she cannot cross the Moenkopi Wash due to high water. 8 TT 1200–03.

The Goldtooth cattle are kept at Goldtooth Ranch (Site 120, diamond). In the winter, the cattle graze in the Buck Pasture, and in the summer, they generally graze outside the Buck Pasture toward the western rim of the Plateau, and north to Ale Manygoats' house (Site 54). 8 TT 1203–04. Dr. Russell testified that in 1991, Lena Canyon owned 11 sheep, 7 goats, 3 cows and 2 horses for a total of 40 SUs). 4 TT 582–84. *See also*, Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (same; Lena Canyon permitted 55 SUs; Other Goldtooths at Site 120 permitted 313 SUs, and owned a total of 109 SUs).

die Cly,[36] Faye Tso,[37] and Maria Wilson.[38] Dr. Scott Russell, who testified extensive-

**36.** *Eddie Cly*, age 72, has lived at Site 44 on the western end of Kerley Valley, north of Moenkopi Wash, since 1942. 8 TT 1215–16. He has a field next to his residence. 8 TT 1216–17, 1222–26.

Cly testified that he owns sheep and goats, which he keeps in herd with sheep belonging to his mother-in-law Mary Bahi Lee and Tom Lee. He estimates that the total number of sheep is 120 mature animals, and they are kept in a corral next to his home. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Eddie Cly and Mary Bahi Lee permitted 42 SUs; no livestock count for 1991; in 1990, owned 29 sheep and goats; Tom Lee's livestock not listed). Cly explained that his sheep count went from 29 in 1990 to 120 today because his sheep were counted separately from Mary Bahi Lee's and Tom Lee's sheep. 8 TT 1222.

Most of the time Cly herds the sheep below the cliff in Kerley Valley to the southwest, and the sheep water from the Wash. He testified that he also herds the sheep up the cliff to graze on the Moenkopi Plateau, and they water at the spring on top of cliff, one mile east of the sewer pond. The sheep graze south about 2 miles, and west to the cliffs. 8 TT 1217–21.

**37.** *Faye Tso*, 59 years old, lives part-time at Site 115, north of Moenkopi Wash, east of the Village of Moenkopi and Tuba City. She stays here overnight sometimes, and her children also stay here when they are out of school. Faye has another home in Tuba City. 8 TT 1250–53.

Tso testified that she has 20 cattle (including young), which use the Whitehorse windmill (south of the Wash), and the windmill north of Site 115 (at Lice Hill). 8 TT 1250. She also has 18 mature sheep and 15 goats, which she herds every day from her corral at Site 115. 8 TT 1253–55. In the summer, she grazes the sheep north of the Wash to the windmill; in the winter, she grazes them to Whitehorse windmill and to Coal Mine Canyon. 8 TT 1256–57. She also owns 6 horses. 8 TT 1255–56. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Faye Tso permitted 60 SUs; in 1991, she had 21 sheep and goats, 8 cattle, and 8 horses, for a total of 93 SUs).

Tso also has a field in the "Many Peaches" allotment area. 8 TT 1259.

Faye Tso and her family used to live in the Tuba Junction area, south of Highway 264, within the present Moenkopi Administrative Unit. Their home burned down on September 18, 1973 when a drunk driver hit the butane tank at their homesite. The Hopi Tribe denied permission for the Tso's to rebuild at that site, and obtained a restraining order in Hopi Tribal Court to prevent them from rebuilding. 8 TT 1274–81.

Faye Tso also testified as to the use of other sites. She testified that Lillie Holgate has lived at Site 113 for 50 years and also has a home in Tuba City. Lillie has sheep, goats, cattle and horses; the sheep graze south of the highway to the Wash, and the cattle and horses graze out to Site 115. *See,* Ex. 5603 (Dr. Russell's summary

of Navajo livestock holdings) (Lillie Holgate is permitted 160 SUs; in 1991, she had 8 cattle and 3 horses, for a total of 47 SUs). Lillie has another house at Site 113 (diamond), although it is not used; Lillie has a field at this site. 8 TT 1230–34.

Faye Tso also testified that Stella Watson has lived at Site 114 for over 20 years. Stella's son and his children also live there full-time. Stella has livestock, including sheep, cattle, horses, and goats. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Stella Watson is permitted 20 SUs; in 1991, she had 12 sheep and goats, 7 cattle and 5 horses, for a total of 65 SUs). The cattle and horses graze east along wash, south to Moenkopi Plateau, and east to the 1882 Reservation border, although they mostly stay around the site north of the Wash.

Finally, Tso testified that her sister, Blanche Taho, has a house east of Moenkopi at Site 116. Blanche is married to Mark Taho, a Hopi originally from Oraibi. Tso testified that Blanche has over 100 mature cattle; all of the cattle belong to Blanche, not her husband, although Mark helps in the care of the cattle. Blanche has a grazing permit from their father (he divided his permit into three for his three children); Blanche bought her brother Paul's permit, and also bought another permit from a Navajo. 8 TT 1241–44, 1285–86. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (Blanche Taho is permitted 350 SUs; in 1991, she had 21 cattle, for a total of 84 SUs). Blanche grazes along the Wash, north to the Lice Hill windmill, and south to the Whitehorse windmill, and to Coal Mine Canyon. Sam Begody (her father's brother) uses the same area for his cattle. 8 TT 1245–49. It is probable that not all of Taho's cattle were counted since a number of people testified that they had over 100 cattle. In 1990, Blanche Taho had 181 cattle. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings).

**38.** *Maria Wilson*, age 53, lives in Tuba City with her husband and five children. Her husband, Paul Jim Wilson, works at the Tuba City True Value hardware store. 8 TT 1291–92.

Maria Wilson has a cattle and horse corral at Site 90, and a horse corral at their homesite in Tuba City. Her brother John Neztsosie and her uncle Kee Benally live in the house at Site 90 full-time. Her father, Hunter Neztsosie, also lived at this site prior to his death in 1989. 8 TT 1295–1300.

Maria has 8 cattle and 1 horse. Her brothers and sisters also have cattle and horses: Clyde Neztsosie has 28 cattle, and John Neztsosie, Louise Secody, and Lucita Johnson each have a few cattle. Maria has a grazing permit through her husband which allows 30 sheep units, and also shares a grazing permit with her brothers and sisters which allows 236 sheep units. 8 TT 1293–95. *See,* Ex. 5603 (Dr. Russell's summary of Navajo livestock holdings) (John Neztsosie

ly in Phase I of this case regarding Navajo use in 1934, also testified in this trial regarding current Navajo use of this area. His testimony is cited with reference to the testimony of the individuals, above. He represented his opinion of Navajo use on Ex. 5001, on which he plotted all current Navajo residences and non-residential structures. His opinion regarding use in Kerley Valley is plotted on a more detailed map, Ex. 5002. Dr. Russell also constructed a list of all the people who were, in his opinion, part-time or full-time residents or "principal users"[39] of each site. *See,* Ex. 5565A. Further, Dr. Russell collected photographs of the main structures at each site, constructed genealogies of the principals at each site,[40] and excerpted 1991, 1990, 1989 and 1968 BIA grazing records for Navajos with livestock. *See,* Ex. 5602. The information from the BIA grazing records for Navajos are summarized in Ex. 5603. (Information from 1991 BIA grazing records for Hopis are summarized in Ex. 5606.) Dr. Russell did not investigate what areas were grazed by Navajo livestock.

Many Navajos in this area, especially the older ones, live full-time at their homesites on Coal Mine Mesa and the Moenkopi Plateau. Many others live part-time in Tuba City (or other towns on the Reservation) and part-time (generally weekends and summers) at their homesites. This part-time use of the homesites is important to these people; often many generations have lived at these homesites (or sites close by within a customary use area), and their periodic return is necessary for conducting livestock operations. Thus, the Court will attempt, as much as is possible, to place full-time *and* part-time residences of Navajos on land partitioned to the Navajo Nation. (All Hopi residences and ranch sites will be within land partitioned to the Hopi Tribe.)

■ Navajo grazing is intensive in and around Pasture Canyon, on the northeastern section of the Moenkopi Plateau (north and south of Moenkopi Wash), south along Coal Mine Canyon to Highway 264, and west to Hollow Place. South of Highway 264, Navajo grazing is intensive within Hollow Place and Little Hollow Place, to Goldtooth windmill, and around the Buck Pasture fence to Little Cowboy windmill, Where the Hills End windmill, and the Salt Water windmill. Navajos also graze in the Buck Pasture, along the western escarpment of the Moenkopi Plateau, and on the northwestern section of the Moenkopi Plateau. Most of the area intensively grazed by Navajos will be partitioned to the Navajo Nation.

■ The water sources most intensively used by Navajos for grazing livestock include the Pasture Canyon Reservoir, Moenkopi Wash, the windmill north of Lice Hill, Whitehorse windmill, Rock Pile windmill, Coal Mine Mesa windmill, Little Cowboy windmill, Goldtooth windmill, Little Hollow Place windmill, and the southern springs on the western escarpment of the Moenkopi Plateau (including Spring on the Rocks and View Point Well). Fewer Navajo livestock use the Salt Water windmill, Where the Hills End windmill, and the water sources on the northwestern Plateau (including Crater Well and a few natural springs). Most of the water sources used intensively by Navajo livestock will be partitioned to the Navajo Nation.[41]

permitted 236 SUs; in 1991, he had 37 cattle and 1 horse, for a total of 153 SUS; no information was given for Paul Jim, Maria Wilson, Clyde Neztsosie, Louise Secody, or Lucita Johnson). She, her brothers and sisters, and her children take care of the cattle. The cattle graze one mile east, and 6–10 miles north of Pasture Canyon. They try to keep the cattle on the east side of the canyon, up to Castle Rocks. The cattle water at Pasture Canyon Reservoir, and at the springs in the canyon north of the Navajo fields. 8 TT 1300–02. Wilson also testified that Elliot Long lives east of Pasture Canyon at Site 104, and has lived there as long as she can remember. He also waters his sheep and goats at the reservoir. 8 TT 1303. Other Navajos water at the reservoir, including Victor Denetso, Jack Watson, the Johnsons, and the Hardy family. 8 TT 1304.

**39.** Dr. Russell defined a principal user as someone who owned livestock or structures at the site, but lived elsewhere. Dr. Russell did not gather information on the amount of time spent at the sites by the residents and users or whether they had another home.

**40.** Many of the Navajos living in Kerley Valley and on the Moenkopi Plateau and Coal Mine Mesa are closely related.

**41.** The Lice Hill, Whitehorse, Little Cowboy, Salt Water and Where the Hills End windmills are not within the 1934 joint use area, and cannot be partitioned to the Hopi Tribe.

■ Navajos farm in Pasture Canyon in the old "Government Pasture" area (north of the Hopi farms), and in the Moenkopi Wash/Kerley Valley, west of the Village of Moenkopi. Most of the latter farms are in the Navajo allotments or north of the Moenkopi Wash. Further, many Navajos have fields at their homesites on Coal Mine Mesa or the Moenkopi Plateau. All of the land on which Navajo farms are located will be partitioned to the Navajo Nation.

## III. *The Bennett Freeze*

In 1966, Robert L. Bennett, then Commissioner of Indian Affairs, established the "Bennett Freeze", which required Hopi consent for actions that "hypothecate the surface or sub-surface resources for exploration, mining, rights-of-way, traders, or other use or occupancy authorized by permit, lease or license." *See*, Ex. 5252 (Letter from Robert Bennett to Graham E. Holmes, Area Director, July 8, 1966). This restriction applied to that part of the 1934 Reservation lying west of the 1882 Reservation and bounded on the north and south by westerly extensions of the northern and southern boundaries of the 1882 Reservation, to the western border of the Navajo Reservation. The Bennett Freeze was intended to protect the interests of the Hopi Tribe pending any negotiated, Congressional, or court resolution of Hopi and Navajo property interests in the 1934 Reservation.

On August 4, 1972, the Freeze was lifted in the Tuba City and Moenkopi Administrative Units (areas immediately surrounding Tuba City and Moenkopi, as defined by the Department of Interior) with respect to "leases, permits, rights-of-way, and other transactions affecting real property interest." Thus, development could take place in the Tuba City Administrative Unit without the consent of the Hopi Tribe, and development could take place in the Moenkopi Administrative Unit without the consent of the Navajo Nation. *See*, Ex. 5048 (Letter from Harrison Loesch, Assistant Secretary of the Interior to Peter MacDonald, Chairman of the Navajo Tribal Council, August 4, 1972). Loesch's letter noted that the lifting of the Freeze in the Administrative Units was not intended to prejudice the interests of either tribe in the resolution of their respective rights to the 1934 Reservation.

The Freeze was codified in 1974 by 25 U.S.C. § 640d–9. That section provided:

> Any development of lands in litigation pursuant to section 640d–7 of this title and further defined as "that portion of the Navajo Reservation lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extension, to the reservation line, of the northern and southern boundaries of said Executive Order Reservation," shall be carried out only upon the written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City. Each such area has been heretofore designated by the Secretary. "Development" as used herein shall mean any new construction[42] or improvement to the property and further includes public work projects, power and water lines, public

---

**42.** "New construction" was first defined in relation to the 1882 Reservation dispute, in CIV 58–579. In an order citing Peter MacDonald, then Chairman of the Navajo Tribal Council, for contempt on May 29, 1974, the District Court found that "new construction" had taken place in violation of the Court's October 14, 1972 Order granting the Hopi Tribe's request for a writ of assistance. The Court defined new construction as that which did not replace a burned or dilapidated building or add to existing buildings. The original judgment of partition of the 1882 Reservation, entered on February 10, 1977, and the final judgment of partition, entered on April 18, 1979, similarly ordered that no "new construction" could be commenced by the Navajos on the HPL without the authorization of the Hopi Tribe. *See also, Sidney v. MacDonald,* 536 F.Supp. 420, 426 (D.Ariz.1982), *aff'd,* 718 F.2d 1453 (9th Cir. 1983) (order finding Chairman MacDonald in contempt recognized that new construction did not include "construction that merely replaces a burned or dilapidated building or construction that adds to an existing building").

In 1988, this Court applied the same definition of "new construction" to the 1934 Reservation dispute when it issued an injunction against the Navajo Nation which required it to make written application to the Hopi Tribe and the BIA for any construction or development activities in the Bennett Freeze area and on the HPL. If either the Hopi Tribe or the BIA disapproved the application, the Court provided that the Navajo Nation could petition the Court for review. *See,* CIV 58–579, document #834, September 26, 1988.

agency improvements, and associated rights-of-way.

Section 640d–9 was amended in 1988, requiring the Tribes to respond to requests for development or construction within 30 days, and providing an administrative appeal procedure if one Tribe refused to give consent to development.

Clayton Honyumptewa, Director of the Office of Hopi Lands for the Hopi Tribe, testified about the responsibilities of his office for the enforcement of the Bennett Freeze. *See generally*, 9 TT 1398–1425 (Honyumptewa). Since 1982, the Office has monitored the Bennett Freeze area for "illegal construction" (i.e. new construction or development), including limited helicopter surveillance of the approximately 2 million acres of the Bennett Freeze area.

The Hopi Tribe contends that any structures built in violation of the Freeze should not influence this Court's decision in partitioning land to the Navajo Nation, because the Freeze was intended to protect Hopi rights to the land in the face of growing Navajo population and development.

Much evidence was introduced by both parties regarding the date at which structures were constructed. The Navajo Nation introduced the testimony of David Brugge, an anthropologist who had done field work in 1967 regarding Navajo use of the area in question. During this time, he had been employed by the Navajo Nation to assist in developing information for the use of Navajo negotiators in the land dispute. He was hired in this case to "retrace his steps" to establish the continuity of Navajo use from 1967 to date. He plotted his findings of past, compared to current, Navajo use on Ex. 5579. *See also*, Ex. 5579B (chart comparing Brugge site numbers with Russell site numbers). The Navajo Nation introduced Brugge's testimony to rebut any Hopi claim that Navajo sites were established after the imposition of the Bennett Freeze. The Navajo Nation also introduced the testimony of Dr. William Graf, a professor of geography from Arizona State University, who interpreted aerial photographs from 1952, 1968, and 1979. His opinion of the 1968 aerial photographs largely corroborated David Brugge's testimony.

 However, with few exceptions, this Court will not consider the date of construction of structures; most of the Navajo sites fall within the areas where Navajo families have been since before 1966, and the date of construction of structures, or the relocation of structures within these areas does not affect the equitable considerations in this case. Some of the Hopi structures were built after the imposition of the Bennett Freeze, as well, but are within areas used by Hopis prior to 1966.

The Bennett Freeze was an administrative, and later statutory, mechanism designed to maintain the "status quo" on the disputed lands in the 1934 Reservation and to prevent contemporary development from affecting the rights of either party. This Court will consider the date of occupation or construction of structures only if there was "new" construction located outside of a prior use area[43] which was not approved by the Hopi Tribe.[44]

The Hopi Tribe pointed to only three Bennett Freeze violations of *new* construction, versus replacement of old homes or repairs. All three were located within a prior use area.

One of these alleged "new construction" violators was Kay Yazzie, who built a hogan at Site 55 in 1982 after relocating from the Hopi Partitioned Lands. Blanche Taho, a Navajo who grazed her cattle in this area, notified the Office of Hopi Lands that Kay Yazzie had constructed a hogan at this site. The field report, Ex. 4221A, dated May 13, 1982, indicates that Yazzie was notified of the

---

43. The Court has purposely avoided using the phrase "traditional use area" or "customary use area", given the indefinite nature of such an area and the extensive acreage claimed by family units under this rubric. A traditional use area is also a shifting target, subject to change with climatic conditions, size of herds, herd management practices, the types of animals grazed (sheep, cattle, or horses), the number of family members using the area, etc.

44. Clayton Honyumptewa testified that the Hopi Tribal Council must approve any new residential construction in the Bennett Freeze area, and has never done so. 9 TT 1414 (Honyumptewa).

violation, and stated that he would not move. 9 TT 1402–05 (Honyumptewa). The Hopi Tribe did not seek to evict Mr. Yazzie. 9 TT 1422–23 (Honyumptewa). Kay Yazzie testified that his wife's family had rights to the area around Site 55 (i.e. it was part of their prior use area). 8 TT 1154–58 (Yazzie). This was not contradicted by the Hopi Tribe.

A second alleged new construction violation was recorded at Site 121, the homesite of Donald and Eleanor Williams. The field report, Ex. 4221B, dated November 17, 1988, indicates that Mr. Honyumptewa, then a field monitor, talked with Donald Williams about the mobile home trailer that Williams said had previously been located about 3 and ½ miles south of Site 121. Mr. Williams was informed of the Freeze violation, and referred to the Navajo–Hopi Development Office for assistance. A second field report, Ex. 4221C, dated October 10, 1989, reported that further structures had been erected, including a wood frame house, two corrals, a sweat lodge, and fencing. A notice was posted on his trailer door that day. A third field trip report, Ex. 4221D, dated December 12, 1991, indicated that the structures were still at the site; no notice was posted or given to Mr. Williams that day. 9 TT 1406–1409 (Honyumptewa). The Hopi Tribe did not seek to evict the Williams from Site 121. 9 TT 1422–23 (Honyumptewa).

Eleanor Williams testified that they moved onto this site in 1986, and that it was formerly a summer camp for Donald's family on which there was a ramada. 8 TT 1166, 1173–74. Although Clayton Honyumptewa testified that he had not seen a ramada at the site since he began working for the Office of Hopi Lands five years ago, 9 TT 1421 (Honyumptewa), the Hopi Tribe did not contradict Eleanor Williams' testimony that the site had been a prior use area of the Williams family.

The Hopis claim that the third site which should not be considered by the Court is Site 60, where Glenmore Begay built a new hogan after the Hopi Tribe tore down the hogan previously inhabited by his father Herbert Zahne. *See,* 6 TT 971–71 (Julia Hadley). The Hopi Tribe originally considered the new hogan to be a violation of the Freeze, but reconsidered and approved the structure, upon condition that the new construction would not be asserted by the Navajo Nation

in a way contrary to the Hopi Tribe's interest in this litigation. This Court finds, in any event, that this site was used by Glenmore Begay's family prior to the construction of his hogan. Further, this site is outside of the 1934 jointly used area and is not subject to partition to the Hopi Tribe.

██ Finally, 25 U.S.C. § 640d–9 prevents development of lands "in litigation". In its final judgment, this Court will order the Bennett Freeze lifted, pending any appeal that might be taken. Residents of the Western Navajo Reservation, both Navajo and Hopi, have waited long enough to see this litigation resolved, and it would be inequitable to continue the restrictions on repair and addition to homes and the development of services essential for comfort and sanitation.

## IV. *Partition*

The Court's partition line is represented on App. A to this opinion.

On the west, the partition line begins at the western edge of the Hopi farms in the "Masaaw" region south of Moenkopi Wash (Hopi field 3.8), travels south to the Moenkopi Plateau, and west to the western escarpment of the Moenkopi Plateau (excluding the Tuba City sewage lagoons). The partition line then travels down the western escarpment of Moenkopi Plateau (at the 4900–foot contour) to a point immediately north of View Point Well. From View Point Well, it travels east to a point directly south of the mid-point of Little Hollow Place. The partition line then turns directly north, passing immediately east of the structures and windmill in Little Hollow Place to Highway 264. The partition line then travels in a slight southeast direction along Highway 264, until it reaches a point directly south of Site 57. The partition line then turns north, passing immediately west of Site 57 to a point just north of Site 57. It then travels northeast to a point immediately west of Rock Pile windmill, and from that point turns directly north until it reaches the middle of Moenkopi Wash. The partition line then travels down the middle of Moenkopi Wash until the township line immediately east of Adams' Site 152 (from the Phase I trial), turns north and travels up the township line. The line then

travels west until it meets the intersection between Highway 160 and Reservoir Canyon/Pasture Canyon. The partition line then follows the eastern wall of Pasture Canyon, until it reaches the southern border of the old "Government Pasture" at the current Navajo farms, then travels across the Canyon and south again along the wall of the Canyon, travelling in a generally southerly extension across the park area to Highway 160. The partition line then follows Highway 160 until it hits the Navajo allotments, and travels along the eastern border of the Navajo allotments. The partition line then follows the base of the Moenkopi Plateau until it reaches the bluff between Lena Goldtooth Canyon's field and ceremonial hogan and the Hopi farms. The partition line will travel up the eastern side of this bluff until it reaches Moenkopi Wash, and then will travel west along the mid-point of the Wash until it reaches the western border of the Hopi farms in the "Masaaw" region, south of the Wash (where the partition line began).

■ The partition line takes a number of factors into account, including (1) avoiding the relocation of individuals, (2) avoiding the disruption of grazing areas, as much as possible, (3) providing 50% of the joint use area acreage to the Hopi Tribe, to the extent possible, (4) fairly and equitably distributing water sources, and (5) ensuring the feasibility of future administration of the partitioned areas, including fencing. Each factor will be discussed in turn.

■ Although the Court has attempted to satisfy every factor, the most important factor is avoiding the relocation of individuals. Every Navajo homesite is located on land partitioned to the Navajo Nation, and every Hopi home and ranch site is located on land partitioned to the Hopi Tribe.

■ Second, to the extent possible, the partition line avoids the disruption of grazing areas and other use patterns. In all cases, where some diminution of an individual's claimed grazing area has occurred, a reasonable grazing area remains intact or is adjacent to other areas grazed by members of the same Tribe.[45]

■ Third, while the Court attempted to partition 50% of the joint use area acreage to the Hopi Tribe it was not possible without including Navajo homesites on the land partitioned to the Hopi Tribe. The acreage of the Hopi exclusive area in 1934 was 22,675. The acreage of the joint use area was 152,843 acres (after subtracting the acreage of the excluded lands on the southern Moenkopi Plateau). The partition line delineated in this Order gives the Hopi Tribe 60,518 acres, which is the exclusive area acreage plus approximately 25% of the joint use area acreage.

Partition of less than 50% of the joint use area to the Hopi Tribe is an equitable result. Although the Court had held that Hopi use of the joint use area was substantial and sufficiently intensive to create a property interest, the evidence was clear that Hopi use was not as intensive as Navajo use of the joint use area in 1934, especially on the northeastern Moenkopi Plateau, Coal Mine Mesa and the southern Moenkopi Plateau. The evidence was not specific enough to quantify a percentage of Hopi use of the joint use area, but it is equitable that the Hopi Tribe receive less than 50% of the area. Further, all areas currently used—and used in any significant way by Hopis in 1934 are partitioned to the Hopi Tribe.[46]

■ Fourth, the Court attempted to distribute water sources equitably, so that every grazing area has access to water. The "Lazy

---

**45.** The Court notes that Lena Canyon and Eddie Cly graze their sheep on the northeastern Moenkopi Plateau, which will be partitioned to the Hopi Tribe. However, Eddie Cly mainly grazes his sheep in Kerley Valley, below the Plateau cliff; this area in Kerley Valley is partitioned to the Navajo Nation and Eddie Cly will retain that portion of his grazing area. Lena Canyon will lose her grazing area on the Plateau; however, she now has only 20 sheep and goats, and nearby grazing areas in Kerley Valley which are a part of the Navajo Reservation can accommodate her needs.

**46.** It would have been possible to partition a part of Ward Terrace to the Hopi Tribe to achieve a 50/50 division of acreage without relocating Navajos. However, no Hopis use Ward Terrace, the Hopi Tribe did not request partition of that area, and some Navajo grazing areas would have been disrupted.

Ranch" windmill, the Little Hollow Place windmill, the springs on the western escarpment of the Moenkopi Plateau north of View Point Well, the Owls Cap windmill, Crater Well and the springs on the northeastern Moenkopi Plateau, and Ironwood Springs are partitioned to the Hopi Tribe. The Hopis also may utilize Moenkopi Wash adjacent to their partitioned land.

The Navajos have as a part of their reservation the windmill at Lice Hill, Whitehorse windmill, Rock Pile windmill, Coal Mine Mesa windmill, Little Cowboy windmill, Goldtooth windmill, the southern springs on the western escarpment of Moenkopi Plateau (Spring on the Rocks and View Point Well), Salt Water windmill, Where the Hills End windmill, and the use of Moenkopi Wash adjacent to the land partitioned to the Navajos. Pasture Canyon Reservoir will be addressed in a later paragraph.

■ The windmill at Little Hollow Place is used intensively by Hopis (including Jonathan Phillips, Robert Charley, Pierson Honahni, and the Lazy Ranch outfit) and Navajos (including Haskey Littleman, Frank Whiterock, Tony Billy, Gee Flatrock, Howard Begay, Alice Edison, Helen George, Lillie Walker, Edith Billy, and Eleanor Williams, some of whom haul water from this source). This windmill will be on land partitioned to the Hopi Tribe to avoid the relocation of the Hopi ranch sites in Little Hollow. Because the partition line is drawn immediately east of the windmill, the Hopi Tribe will be ordered to install a pipe from Little Hollow Place windmill to troughs outside the boundary line (on the assumption that a fence will be built). This pipe must deliver sufficient water for the livestock belonging to the Navajo individuals listed above, up to a maximum of one half of the water produced by Little Hollow Place windmill. The Hopi Tribe will be required to install the pipe within 90 days of a final order of partition; the pipe and any trough shall be maintained by the Navajo Nation.

■ Although Rock Pile windmill is also immediately adjacent to the partition line, no Hopi individual testified that they used that water source for their livestock. The Navajo Nation will therefore not be ordered to provide water from Rock Pile windmill to troughs inside the partition line.

■ Fifth, the partition line ensures the feasibility of future administration of the partitioned areas. The partition line is in straight lines when possible to facilitate fencing. Further, the western boundary of the land partitioned to the Hopi Tribe is the western escarpment of the Moenkopi Plateau, and part of the northern boundary follows the mid-point of Moenkopi Wash, so that no fencing is necessary in these areas.

It was not possible to make the land partitioned to the Hopi Tribe contiguous to the existing Hopi Reservation. The joint use area in 1934 did not extend to the border of the 1882 Reservation, and that area could thus not be partitioned to the Hopi Tribe. Moreover, the land partitioned to the Hopi Tribe is connected to the Hopi Reservation by Highway 264, which travels directly from the Village of Moenkopi to the Hopi villages on the mesas. In the modern world of transportation, this connection is perhaps more important than contiguity of land.[47]

A few areas require special consideration, including the partition of Pasture Canyon, the partition to the Navajo Nation of land north of the Moenkopi Wash at the western end of Kerley Valley (on which two Hopi farms are located), and the partition to the Navajo Nation of land on which the Tuba City sewage lagoons are located.

In Pasture Canyon, the Hopi Tribe will be partitioned the land within Pasture Canyon from the southern border of the old "Government Pasture" (now the southern border of the Navajo farms), to Highway 160. Navajo Sites 108, 103, and 110 will remain on Navajo land, as the land partitioned to the Hopi Tribe is restricted to the confines of the canyon walls, and a southerly extension of the canyon walls to Highway 160. Across Highway 160, this connects with "Reservoir Canyon", which also will be partitioned to the Hopi Tribe.

■ The area partitioned to the Hopi Tribe includes the Hopi farms south of the

---

47. A similar circumstance occurred in the 1882 partition, wherein the Jeddito area partitioned to the Navajo Nation is surrounded by the Hopi Reservation.

old Government Pasture, Pasture Canyon Reservoir, and the park area which extends south from Pasture Canyon Reservoir to Highway 160. This Court will order that as long as the land south of the Reservoir remains a park area, the public has a license and/or easement to utilize the park for recreational purposes. If the area ceases to be used as a park, the Hopi Tribe may petition the Court for termination of the license and/or easement after public notice and hearing.

■ Pasture Canyon Reservoir is partitioned to the Hopi Tribe because there was substantial evidence that Hopis have always maintained the Reservoir and its irrigation system.[48] The irrigation ditches running through the Navajo farms in the old Government Pasture from springs at the head of Pasture Canyon must be maintained in order to ensure that water flows to the reservoir. The evidence shows that at least some of the Navajos farming in Pasture Canyon have not adequately maintained the irrigation ditches running across their farms.[49] The Court will

thus grant the Hopi Tribe an easement to maintain the ditches running across the Navajo farms, with access for those purposes to occur after reasonable notice to the Navajo Nation and to the individual Navajos farming in Pasture Canyon. This Court will retain jurisdiction to consider any injunctive relief and/or damages claims against the Navajo Nation respecting disturbance or damage to the irrigation ditches by Navajo individuals or livestock.

■ There was evidence that a number of Navajos water and graze livestock within Pasture Canyon.[50] This Court will grant those Navajo families presently using Pasture Canyon Reservoir a license and/or easement to water their livestock. This license and/or easement does not extend to grazing Navajo livestock within the section of Pasture Canyon partitioned to the Hopis, including at the sides of the Reservoir (except for that grazing impossible to prevent while watering animals). If the Hopi Tribe chooses to build a pipeline from the Reservoir to troughs on the eastern and western sides of

---

**48.** Alton Honahni, Sr. testified that he was on the Moenkopi Irrigation Committee from 1963–1975; the Irrigation Committee took care of the reservoir and irrigation ditches in Pasture Canyon and the ditches running from the highway to the Hopi allotted land. Each year, the Committee cleaned out the ditches coming from the springs at the top of Pasture Canyon (north of the old Government Pasture); no Navajos helped with this work. The Irrigation Committee also notified Hopis when it was their turn to use the water. Honahni testified that two Navajos, Harry and Albert Goldtooth, had once asked for permission to use the Pasture Canyon water; the Hopis denied this request when they decided that there was not enough water for the Navajos. 2 TT 384–387.

William Numkena testified that Hopi men maintained the irrigation ditches in Pasture Canyon as a group effort when he was young, and that each farmer now maintains the ditch that passes through his section of the land. 2 TT 218–219.

Gilbert Naseyowma testified that Hopis have been maintaining Pasture Canyon Reservoir for as long as he can remember. There is a committee of those Hopis who use the water from Pasture Canyon Reservoir, and those who use the water must clean the irrigation ditches. He testified that only the members of this committee, including he, Loren Phillips, Alfred Elmer, and Silas Ponyah, have keys to the padlocks on the water gates at the reservoir; when the reservoir gates are opened, water flows into a lower reser-

voir, and then into pipelines which take the water across the highway to the Hopi fields. 2 TT 339–41.

Eugene Kaye testified that only Hopis have worked on the irrigation ditches in Pasture Canyon. 3 TT 452–53. None of this testimony was contradicted by the Navajo Nation.

**49.** Although William Numkena testified that Navajos have not "interfered" with the water in Pasture Canyon, 2 TT 234–35, Eugene Kaye testified that the Navajos farming in the old Government Pasture area do not clean their sections of the irrigation ditches and allow livestock to graze by the ditches; this causes the irrigation ditches to flood the northern Hopi fields, and less water flows into the Reservoir. 3 TT 452–53.

**50.** Maria Wilson and her family graze approximately 37 cattle on the east side of Pasture Canyon up to Castle Rocks, and water them at Pasture Canyon Reservoir and at springs in the canyon north of the Navajo fields. 8 TT 1300–02. Wilson also testified that Elliot Long, Victor Denetso, Jack Watson, the Johnsons, and the Hardy family water their livestock at the Reservoir. 8 TT 1303–04. Also, Angela Maloney testified that she and her family have 80 sheep and goats which they graze on both sides of Pasture Canyon, in the Canyon to the Reservoir, and on both sides of the Reservoir. She also testified that the Yazzie family, Elliot Long, and the Johnsons water their livestock at the Reservoir. 7 TT 1122–24.

the Reservoir (outside of the boundary), or some other measure which will ensure a continuous water supply for Navajo livestock, the Hopi Tribe may petition this Court for termination of the license and/or easement.

■ Next, in order to arrive at a partition line which was administratively feasible, the Court avoided the creation of small "islands" of Hopi or Navajo land within land partitioned to the other Tribe. Thus, the Court will partition land on the north side of Moenkopi Wash at the western end of Kerley Valley to the Navajo Nation. A few Hopi farms are located in this area, including fields belonging to Eugene Kaye and Steven Albert. *See*, Ex. 4437 (Honyumptewa's map of farms in Kerley Valley). Eugene Kaye testified that he started farming this field only four years ago and it had generated very little production. Further, Kaye was not sure whether Albert had planted this field this year. 3 TT 444–45, 461. Eugene Kaye has other fields: a field southwest of the Village of Moenkopi within the Moenkopi Administrative Unit, a field east of the Village in the Moenkopi Spring area, and two fields in Pasture Canyon. 3 TT 442–43; *see*, Exs. 4437 and 4438. Steven Albert also has a farm in Reservoir Canyon (below Highway 160). *See*, Ex, 4437.

The only Navajo field on the south side of Moenkopi Wash belongs to Lena Canyon;[51] she also has ceremonial hogans and other structures south of the wash. 8 TT 1193–75. However, since this is adjacent to the Navajo allotments, which extend south of the Wash and will be partitioned to the Navajo Nation, partitioning Lena Canyon's field and ceremonial area to the Navajo Nation will not create an "island" of Navajo interest. The partition line will be drawn immediately east of the bluff separating Canyon's field and ceremonial area from the Hopi farms south of the Wash.

■ Next, the land on which the Tuba City sewage lagoons are located will be partitioned to the Navajo Nation. There is no current Hopi use south of Moenkopi Wash west of the Hopi farms in the "Masaaw" area. Further, the sewage lagoons were built with Navajo tribal funds and a grant from the Public Health Service. *See*, Ex. 5513 (Memo from General Superintendent, Navajo Agency, to Area Director, dated June 30, 1965). The Navajo Nation and Hopi Tribe agreed that the Navajo Nation could construct the sewage lagoons if the Village of Moenkopi could utilize the sewage services in a non-discriminatory manner. *See*, Ex. 4132 (Memo from Irving Billy, Tuba City Agency Superintendent, to Area Director, Navajo Area Office, dated July 8, 1981, and attached agreement). Any agreements between the Navajo Nation and Hopi Tribe regarding the use of the sewage lagoons are unaffected by this partition.

## CONCLUSIONS OF LAW

The Navajo–Hopi Land Settlement Act, 25 U.S.C. § 640d *et seq.,* grants this Court jurisdiction to settle title to the 1934 Reservation. 25 U.S.C. § 640d–7 provides that lands in which the Court found the Navajo have exclusive interest will remain a part of the Navajo Reservation, that lands in which the Hopi have an exclusive interest will become a reservation for the Hopi Tribe, and that lands in which the Navajo and Hopi have a joint or undivided interest shall be partitioned by the Court "on the basis of fairness and equity".

■ Both the surface and subsurface rights to the 1934 Reservation will be partitioned. In the partition of the 1882 Reservation, only the surface rights were subject to partition. 25 U.S.C. § 640d–6 provides:

> Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of the coal, oil, gas, and all other minerals within or underlying such lands . . .

Section 640d–6 does not apply to the areas jointly used by the Navajo and Hopi on the 1934 Reservation. Section 640d(a) specifies that the language "joint use area" in the statute refers to "lands within the reservation established by the Executive order of December 16, 1882, except land management district no. 6."

---

**51.** Although Ex. 4469 shows four Navajo fields south of the Wash, the evidence at trial demonstrated that only Lena Canyon farmed south of the Wash, and the Navajo proposed partition line included these other fields in the Hopi area.

The legislative history lends support for the conclusion that Congress intended this Court to partition the surface and subsurface rights to the 1934 Reservation. The title of the House report accompanying H.R. 10337, which amended, was adopted as the Navajo–Hopi Settlement Act, reads:

"Authorizing the partition of the surface rights in the joint use area of the 1882 Executive order Hopi Reservation and the *surface and subsurface rights in the 1934 Navajo Reservation* between the Hopi and Navajo Tribes, providing for allotments to certain Paiute Indians, and for other purposes.

H.R.Rep. No. 93–909, 93rd Cong., 2nd Sess. (1974) (emphasis added). The Senate report accompanying H.R. 10337 also stated that the legislation was to "authorize the partition of ... the surface and subsurface rights in the 1934 Navajo Reservation between the Hopi and Navajo Tribes." S.Rep. No. 93–1177, 93rd Cong., 2nd Sess. 1 (1974).

The Court's April 27, 1992 findings set forth the boundaries of the exclusive and joint use areas in 1934, and are more specifically delineated in the Factual Findings, above. The boundaries for the exclusive and joint use areas are represented on Appendix A to this opinion.

The joint use area will be partitioned on the basis of "fairness and equity". The Navajo–Hopi Settlement Act does not give the Court guidelines for the application of "fairness and equity". The lack of standards in section 640d–7, as compared with section 640d–5 which listed detailed criteria for the partition of the 1882 Reservation, indicates that Congress intended to grant the Court broad discretion in the partition of the 1934 Reservation. Further, the absence of an "owelty" provision indicates that Congress did not intend equality of acreage and/or value to be mandatory in the partition of the 1934 Reservation.

The law of the case similarly does not mandate partition on the basis of equality of acreage and/or value. While the Hopi Tribe has a one half interest in the jointly occupied lands, *see Sekaquaptewa I,* 448 F.Supp. at 1996, *rev'd in part, Sekaquaptewa II,* 619 F.2d at 809–810, neither Court specifically considered the appropriate standards for partition. The June 2, 1978 Partial Judgment reserved all questions relating to the partition. Further, the Ninth Circuit did not direct the District Court on remand to partition jointly held lands on an equal basis, requiring only that the District Court "declare title to be joint or undivided, subject to partition." *Sekaquaptewa II,* 619 F.2d at 809.

■■■■■ All of the property partitioned to the Hopi Tribe shall be held in trust by the United States exclusively for the Hopi Tribe as part of the Hopi Reservation; all of the property partitioned to the Navajo Nation will be held in trust by the United States exclusively for the Navajo Nation as part of the Navajo Reservation. Each will be held free from all interests of the other Tribe and its individual members, except as subject to the licenses and/or easements set forth in the Order of this Court. Lands partitioned to the Navajo Nation shall be subject to the jurisdiction of the Navajo Nation, to the same extent as is applicable to other portions of its reservation. 25 U.S.C. § 640d–9(e). Lands partitioned to the Hopi Tribe shall be subject to the jurisdiction of the Hopi Tribe to the same extent as is applicable to other portions of its reservation. 25 U.S.C. § 640d–9(e).

■■■■■ The partition does not affect the title, possession, and enjoyment of lands allotted to Hopi and Navajo individuals for which patents have been issued. All Hopi allotments are located on land partitioned to the Hopi Tribe and those individuals will be subject to the jurisdiction of the Hopi Tribe. All Navajo allotments are located on land partitioned to the Navajo Nation and those individuals will be subject to the jurisdiction of the Navajo Nation. 25 U.S.C. § 640d–16.

Pursuant to 25 U.S.C. § 640d–18(b) and 18(c), the Secretary will be ordered to provide for the survey, location of monuments, and fencing of boundaries of the land partitioned to the Hopi Tribe, within twelve months of a final order of partition.

The Court's partition line is represented on App. A to this opinion. A description of the partition line is found in the Findings of Fact, above.

The partition takes a number of factors into account, including (1) avoiding the relocation of individuals, (2) avoiding the disruption of grazing and farming areas, to the extent possible, (3) providing 50% of the joint use area acreage to the Hopi Tribe, to the extent possible, (4) equitably distributing water sources, and (5) ensuring the feasibility of future administration of the partitioned areas, including fencing. Some of these factors were set forth in section 640d–5 governing the partition of the 1882 Reservation; it is not mandatory that the Court employ section 640d–5(a)–(f) in the partition of the 1934 Reservation. *See, Sekaquaptewa II*, 619 F.2d at 807 ("the statute and order in *Healing* used different language in a different legislative setting than the 1934 Act.")

Of primary importance is avoiding relocation of individuals; every Navajo homesite is located on land partitioned to the Navajo Nation, and every Hopi home and ranch site is located on land partitioned to the Hopi Tribe. Further, where some diminution of an individual's claimed grazing area has occurred, a reasonable grazing area remains intact or is adjacent to other areas grazed by members of the same Tribe.

While the Court attempted to partition 50% of the joint use area acreage to the Hopi Tribe, it was not possible without including Navajo homesites on land partitioned to the Hopi Tribe, and thus entail the possibility of relocation. The acreage of the Hopi exclusive area in 1934 was 22,675 acres. The acreage of the joint use area was 152,843 acres (after subtracting the 14,976 acres of the excluded lands on the southern Moenkopi Plateau). The partition gives the Hopi Tribe 60,518 acres, which is the exclusive area acreage plus 25% of the joint use area acreage.

Partition of less than 50% of the joint use area to the Hopi Tribe is an equitable result. Although the Court had held that Hopi use of the joint use area was substantial and sufficiently intensive to create a property interest, the evidence was clear that Hopi use was not as intensive as Navajo use of the joint use area in 1934, especially on the northeastern Moenkopi Plateau, Coal Mine Mesa and the southern Moenkopi Plateau. The evidence was not specific enough to quantify a percentage of Hopi use of the joint use area, but it is equitable that the Hopi Tribe receive less than 50% of the area. Further, all areas currently used in any significant way by Hopis are partitioned to the Hopi Tribe.

Finally, the Court concludes that violations of the Bennett Freeze and 25 U.S.C. § 640d–9 do not affect the equitable considerations in this case, as all of the Navajo sites alleged to be violations fall within the prior use areas of Navajo families. The Court will order the Bennett Freeze lifted.

In accordance with the above Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

(1) The surface and subsurface lands of the 1934 Reservation are hereby partitioned between the Navajo Nation and the Hopi Tribe, in accordance with the description contained in the Findings of Fact, and as represented on Appendix A to this opinion.

(2) That all of the property partitioned to the Hopi Tribe as delineated above, shall be held in trust by the United States exclusively for the Hopi Tribe and as a part of the Hopi Reservation, and that the United States hold the same in trust for the Hopi Tribe severally and absolutely free from any and all claims of the Navajo Nation and the members thereof, except as hereinafter specifically set out.

(3) That all of the property partitioned to the Navajo Nation as delineated above, shall be held in trust by the United States exclusively for the Navajo Nation and as a part of the Navajo Reservation, and that the United States hold the same in trust for the Navajo Nation severally and absolutely free from any and all claims of the Hopi Tribe and the members thereof, except as hereinafter specifically set out.

(4) That lands partitioned to the Navajo Nation shall be subject to the jurisdiction of the Navajo Nation, to the same extent as is applicable to other portions of its reservation. 25 U.S.C. § 640d–9(e).

(5) That lands partitioned to the Hopi Tribe shall be subject to the jurisdiction of the Hopi Tribe to the same extent as is applicable to other portions of its reservation. 25 U.S.C. § 640d–9(e).

(6) That this Judgment does not affect the title, possession, and enjoyment of lands

heretofore allotted to Hopi and Navajo individuals for which patents have been issued. All Hopi allotments are located on land partitioned to the Hopi Tribe, and those individuals shall be subject to the jurisdiction of the Hopi Tribe; all Navajo allotments are located on land partitioned to the Navajo Nation, and those individuals shall be subject to the jurisdiction of the Navajo Nation. 25 U.S.C. § 640d–16.

(7) That pursuant to 25 U.S.C. § 640d–18(b) and 18(c), the Secretary shall provide for the survey, location of monuments, and fencing of boundaries of the land partitioned to the Hopi Tribe, which shall be completed within twelve months of a final order of partition.

(8) That upon completion of said survey, the United States shall cause to be expeditiously filed with the Court a certified copy of the survey findings and determination.

(9) That the Hopi Tribe shall install a pipe from the Little Hollow Place windmill to troughs outside the boundary line, within 90 days of a final order of partition. This pipe must deliver sufficient water to provide for the livestock belonging to the Navajo individuals listed as users in the Findings of Fact, above, up to a maximum of one half of the water produced by Little Hollow Place windmill. The pipe and any trough shall be maintained by the Navajo Nation.

(10) That the public is granted a license and/or easement to utilize the park area south of Pasture Canyon Reservoir for recreational purposes. If this area ceases to be used as a park, the Hopi Tribe may petition this Court for termination of this license and/or easement after public notice and hearing.

(11) That the Hopi Tribe is granted a license and/or easement to maintain the ditches running across the Navajo farms in the northern part of Pasture Canyon, which access to occur only after adequate notice to the Navajo Nation and to the individual Navajos farming in Pasture Canyon.

(12) That the Navajos farming in Pasture Canyon shall prevent their stock from destroying or damaging the irrigation ditches running through the upper part of Pasture Canyon; this Court will retain jurisdiction to consider any injunctive relief and/or damages claims against the Navajo Nation respecting disturbance or damage to the irrigation ditches by Navajo individuals or livestock.

(13) That those Navajo families presently using Pasture Canyon Reservoir are granted a license and/or easement to water their livestock. This license and/or easement does not extend to grazing Navajo livestock within the section of Pasture Canyon partitioned to the Hopis, including at the sides of the Reservoir (except for that grazing impossible to prevent while watering animals). If the Hopi Tribe chooses to build a pipeline from the Reservoir to troughs on the eastern and western sides of the Reservoir (outside of the boundary), or some other measure which will ensure a continuous water supply for Navajo livestock, then the Hopi Tribe may petition this Court for termination of this license and/or easement.

(14) That the "Bennett Freeze" restriction on construction and development within the 1934 Reservation, and codified by 25 U.S.C. § 640d–9, is lifted.

IT IS FURTHER ORDERED that each of the parties shall, within 20 days from the date of this Order, pay to the Clerk of this Court the sum of $1,232.24, covering one-half the Court's cost for a computer generated acreage calculation and map of the lands partitioned by this Judgment.

## APPENDIX A

## ORDER RE: HOPI TRIBE'S MOTION TO ALTER OR AMEND JUDGMENT

### Dec. 21, 1992

The Hopi Tribe has filed a motion to alter or amend this Court's September 25, 1992 Judgment re: Partition of the 1934 Reservation. The Hopi Tribe requests that the judgment require the Navajo Nation to install a pipe from the Rock Pile windmill, immediately outside the boundary of the land partitioned to the Hopi Tribe, to troughs inside the boundary line. The Navajo Nation has no objection, and this provision will be incorporated into the final judgment. The Hopi Tribe recounts evidence presented at trial which indicates that Hopis use the Rock Pile windmill for watering their livestock.[1] This Court's Findings of Fact are thus amended to reflect the use of Rock Pile windmill by Hopis.

In response to the Hopi Tribe's motion to alter or amend the Judgment, the Navajo Nation submitted a proposed form of judgment, and a memorandum in support which identifies ambiguities in the Findings and Judgment which may create future disputes when surveying the area partitioned to the Hopi Tribe.

First, the Navajo Nation states that this Court's map, attached to the September 25 Findings and Judgment, excludes a Hopi ranch and corral from land partitioned to the Hopi Tribe in Little Hollow Place. The Navajo Nation suggests moving the partition line to a line 100 feet east of the easternmost Hopi structure; this proposal results in the partition of approximately 800 more acres to the Hopi Tribe. The Hopi Tribe concurs. This Court's intent was to include all Hopi structures within land partitioned to the Hopi Tribe, and the partition line will be moved to the east in Little Hollow Place, as reflected in the Navajo Nation's proposed judgment.

Second, the Navajo Nation states that the partition line on the Court's map, and the partition line as described in the Findings, are inconsistent in their treatment of the Goldtooth family's area south of Moenkopi Wash. The Court's map shows the partition line as following the upper edge of the Moenkopi Plateau, and running along the eastern border of the Hopi farms in the "Masaaw" area south of the Wash. In contrast, the Findings describe the partition line as following the base of the Plateau,[2] and running along the eastern edge of a bluff between the Goldtooth area and the Hopi farms, which excludes some of the Goldtooth structures in that area.

The Navajo proposed judgment proposes amending the Findings to follow the line on the map, which would include the cliffs below the Plateau in land partitioned to the Navajo Nation. The Navajos argue that the Goldtooth family has a corral near Goldtooth Spring above the base of the Plateau, see Site 45E on Ex. 5001, and there was no evidence that Hopis used the cliffwall overlooking the Goldtooth farms. Further, the Navajos argue that there was no evidence of Hopi use of the bluff between the Goldtooth structures and the Hopi farms, and partitioning this area to the Navajo Nation would provide privacy for the Goldtooth family's ceremonials held south of the Wash.

The Hopi Tribe advocates following the written Findings, in which the partition line follows the base of the Plateau, but proposes redrawing the partition line so that it runs 100 feet west of the westernmost Goldtooth structures, so as to include all Navajo structures in land partitioned to the Navajo Nation.

This Court will adopt each party's position, in part. The partition line will follow the 4700-foot contour line of the Moenkopi Plateau, near the top of the Plateau. The Navajo allotments immediately to the east of the Goldtooth area extend to the 4700-foot con-

---

1. Wilfred Kaye testified that he and other Hopis use "Windmill No. 3", depicted on Ex. 4422, which refers to Rock Pile Windmill. TT 148–153, 167, 180.

2. The Navajo Nation also argues that the Findings describing the 1934 Hopi exclusive use area indicates a boundary along the upper edge of the Moenkopi Plateau, consistent with the Court's map. However, the definition of the 1934 Hopi exclusive use area does not control the location of the partition line, except to the extent that the Hopi exclusive use area must be included in the area partitioned to the Hopi Tribe.

tour line, and an extension of this boundary enables the Goldtooth family to keep its corral and to utilize the spring on the cliffwall of the Plateau. Further, the partition line will travel from the top of the Plateau from a point immediately south of the point at which the partition line in the Court's written findings turned east, directly north to where it intersects with the unimproved dirt road just south of the wash. Attachment A to this Order depicts the partition line to be described in the final judgment; the partition line follows the red line until it intersects with the black line, which intersects with the unimproved road. (The red line follows the Court's map, the blue line follows the Court's written Findings, and the purple and white dashed line follows the Hopi Tribe's proposal.) The western boundary will provide privacy for the Goldtooth ceremonies, and provide a "buffer" between the Hopi farms and Navajo land.

Third, in its proposed judgment, the Navajo Nation proposes a more explicitly defined boundary for Pasture Canyon. Because the "park" area south of Pasture Canyon Reservoir is not defined by steep walls, a more explicit partition line through this area would avoid dispute during the surveying process. Essentially, the Navajo Nation proposes following the tree line for the western and eastern boundaries below the Reservoir. The Navajo proposed judgment also defines a boundary for the Hopi land within Pasture Canyon.

The Hopis object to the Navajo Nation's proposed boundary. First, the proposed boundary is defined at the water line of the Hopi Reservoir, eliminating any possibility of expanding the size of the Reservoir. On reply, the Navajos agree that the boundary within the Canyon should be set at 200 feet on each side of the Reservoir's high-water mark, and this will be reflected in the Court's final description of the partition line.

The Hopi Tribe also objects that the Navajo proposed judgment too narrowly defines Hopi partitioned lands south of the Reservoir through the "park" area, and suggests alternative language to the Navajos' proposed judgment. The Navajo Nation objects that the Hopi proposed line passes too close to Navajo homes on each side of this area and that there was no evidence of Hopi use of this extra acreage. The Court will adopt an intermediate position. On the east side, the partition line will travel north along the unimproved dirt road, from Highway 160, until it reaches the intersection of a second unimproved dirt road (just northeast of the label "A" on Ex. 4176A). At that point, the partition line will travel north (where the first north-south unimproved road travels slightly northwest), 200 feet from that unimproved road, until the line reaches a point 200 feet east of the southern tip of Pasture Canyon Reservoir. The partition line will then follow 200 feet east of the eastern high-water mark of Pasture Canyon Reservoir, travel west along the old "Government Pasture" fence, and follow 200 feet west along the western high-water mark of the Reservoir. At a point 200 feet west of the southern point of the Reservoir, the partition line will follow the tree line, as depicted on Attachment B.

 Also, the Hopis request an amendment to the easement granted to the Hopi Tribe to maintain the irrigation ditches running through the Navajo farms in the upper part of Pasture Canyon, so that the Hopi Tribe will be allowed to "improve" the ditches, as well as maintain them. The Navajo Nation does not object to allowing the Hopi Tribe to install pipes or otherwise enclose the ditches, but objects that an open-ended permission to "improve" the ditches may allow the Hopi Tribe to impound or capture the springs on which the Navajo farmers depend. The Court's amended easement will allow the Hopi Tribe to "improve" the irrigation ditches, as requested, but will specifically prohibit the Hopi Tribe from interfering with Navajo use of the springs in Pasture Canyon.

The Hopi Tribe points out that the Court's map is inconsistent with the written Findings on Coal Mine Mesa, around Site 57 belonging to Gee Flatrock. The Hopi Tribe is correct that the Court's intention was to place Navajo Site 57 just outside the boundary of the land partitioned to the Hopi Tribe.[3] The Court's map (and hence, the Navajo's pro-

---

3. The Court intended the boundary to proceed southeast along Highway 264 to a point "directly south of Site 57", and then turn north "passing immediately west of Site 57 to a point just north of Site 57." September 25, 1992 Findings, p. 57.

posed judgment), gives a margin of 2000 feet on the west and north of Site 57. The Hopi Tribe proposes that the boundary should be 100 feet within Site 57, similarly to the boundary provided around the Hopi structures in Little Hollow Place. The Court will adopt the Hopi proposal as expressing the intent of the Court in its partition order; this change will give the Hopi Tribe approximately 640 more acres.

■ Finally, the San Juan Southern Paiute Tribe (Paiute Tribe) objects to the Navajo Nation's proposed judgment, to the extent that it did not provide for joint administration over the lands in which this Court held the Paiute Tribe had an interest. However, the Navajo Nation is correct that the declaration of the Paiute interest does not confer any jurisdiction on that Tribe over those lands. This Court has previously held that it does not have jurisdiction to partition land to the Paiute Tribe, nor to create a reservation for that Tribe. *See* March 13, 1992 Order at 13. Congress has defined the Paiutes' exclusive remedy as the allotment of parcels of land to Paiute individuals, which precludes the judicial creation of a different remedy. 25 U.S.C. 640d–8. *Id.* at 12.

Further, the Navajo Nation is correct that *Healing v. Jones,* 210 F.Supp. 125, 192 (D.Ariz.1962), did not provide that the joint use area was to be jointly administered by the Hopis and Navajos. Instead, the Court held that because the Court lacked jurisdiction to partition the joint use area, "[i]t will not be for the two tribes and Government officials to determine whether ... the area ... can and should be fairly administered as a joint reservation."

Finally, the Settlement Act conditions that a tribe's civil and criminal jurisdiction over land partitioned to it, stating that "each tribe shall have such jurisdiction and authority over any lands partitioned to it and all persons located thereon ... to the same extent as is applicable to those other portions of its reservation" 25 U.S.C. 640d–9(e)(1)(B). The latter clause, "to the same extent as is applicable to those other portions of its reservation," also indicates that the exercise of jurisdiction is not available to the Paiute Tribe, because the Paiute Tribe does not have a reservation. The Navajos' proposed judgment will thus be adopted regarding the Paiute Tribe.

These conclusions, and those expressed in the Court's September 25 Findings of Fact and Conclusions of Law and Judgment, as amended by this order, will be set forth on a separate document, as required by Fed. R.Civ.P. 58.

Accordingly,

IT IS HEREBY ORDERED that the Court's Findings of Fact, Conclusions of Law and Judgment, dated September 25, 1992 are amended, in accordance with this Order.

ATTACHMENT A

ATTACHMENT B

## ATTACHMENT A

Beginning at a point common to the States of Arizona, New Mexico, Colorado, and Utah, thence west along the boundary line between the States of Arizona and Utah to a point where said boundary line intersects the Colorado River; thence down the south bank of that stream to its confluence with the Little Colorado River; thence following the north bank of the Little Colorado River to a point opposite the east boundary of the Grand Canyon National Park; thence south along said east boundary to the southeast corner of section 5, township 30 north, range 6 east, Gila and Salt River base and meridian, Arizona; thence east to the southeast corner of section 4; thence south to the southwest corner of section 10; thence east to the southeast corner of section 10; thence south to the southwest corner of section 14; thence east to the northwest corner of the northeast quarter section 23; thence south two miles to the southeast corner of the southwest quarter section 26; thence west one half mile to the southeast corner of section 27, township 30 north, range 6 east, Gila and Salt River base and meridian, Arizona; thence south seven miles to the southwest corner of section 35, township 29 north, range 6 east; thence east one mile; thence south one and one half miles to the southwest corner of the northwest quarter section 12, township 28 north, range 6 east; thence east through the center of section 12 to the range line between ranges 6 and 7 east; thence south along said range line five and one half miles to the southeast corner of section 1, township 27 north, range 6 east; thence west three miles to the southwest corner of section 3, township 27 north, range 6 east; thence south five miles to the southeast corner of section 33, township 27 north, range 6 east; thence east along township line between townships 26 and 27, six and one half miles, to the northeast corner of the northwest quarter section 8, township 26 north, range 7 east; thence south two miles to the southeast corner of the southwest quarter section 10, township 26 north, range 7 east; thence east four and one half miles to the southeast corner of section 8, township 26 north, range 8 east; thence north four miles to the northwest corner of section 28, township 27 north, range 8 east, Gila and Salt River base and

meridian; thence east one mile to the southeast corner of section 21; thence north four miles to the northeast corner of section 4, township 27 north, range 8 east, thence east along township line between townships 27 and 28 north to its intersection with the Little Colorado River; thence up the middle of that stream to the intersection of the present west boundary of the Leupp Extension Reservation created by Executive order of November 14, 1901; thence south along the present western boundary of said extension to where it intersects the fifth standard parallel north; thence east along said standard parallel to the southwest corner of township 21 north, range 26 east, Gila and Salt River base and meridian; thence north six miles to the northwest corner of township 21 north, range 26 east; thence east twelve miles to the northeast corner of township 21 north, range 27 east; thence south two miles; thence east twelve miles; thence south four miles; thence east along the township line between townships 20 and 21 north to the boundary line between the States of New Mexico and Arizona; thence north along said boundary line to the point of beginning.

however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882.

## ATTACHMENT B

### Hopi Partitioned Lands

The Hopi Partitioned Lands are situated in Township 30 North, Range 11 East; Township 30 North, Range 12 East; Township 31 North, Range 10 East; Township 31 North, Range 11 East; Township 31 North, Range 12 East; Township 32 North, Range 11 East; Township 32 North, Range 12 East, of the Gila & Salt River Base & Meridian, Coconino County, Arizona, within the boundary described as follows:

(a) Starting at a point of beginning at the middle of the streambed of the Moenkopi Wash at the sharp bend in that streambed (where it changes its direction of flow from southeasterly to westerly) situated in Section 1 of Township 31 North, Range 10 East, approximately 1,500 feet east of the western

boundary of said Section 1, then proceeding due south to the top of the northern rim of the Moenkopi Plateau at approximately 4,800 feet of elevation;

(b) then proceeding in a generally west-southwesterly direction along the rim of Moenkopi Plateau at 4800 feet of elevation to a point due north of the point on the USGS 7.5–minute topographic map, Moenave SE quadrangle (1969) which is marked 'x4955' (said point being approximately 4950 feet south of the southwest corner of the Sewer Lagoon in Kerley Valley); then proceeding due south approximately 200 feet to a point on the rim of Moenkopi Plateau which is at 4900 feet of elevation; then proceeding in a generally southerly direction along the rim of Moenkopi Plateau along the rim of Moenkopi Plateau along the 4900–foot contour line, passing to the west of the developed springs at Toh Nee Di Kishi, Tohnali, and Seller Springs, to a point on the rim of the plateau which is approximately 500 feet west and immediately north of View Point Well;

(c) then proceeding due east to a point directly south of the Hopi stone house in the Little Hollow Place (said house being approximately 1,500 feet east of the Little Hollow Place Windmill);

(d) then continuing due east a distance of another 100 feet;

(e) then proceeding from that point due north, passing 100 feet to the east of the Hopi stone house in Little Hollow Place, to the center of the right-of-way of Arizona Highway 264 (provided, however, that the partitioning fence to be built by the United States shall terminate where it meets the fence now existing along the southern edge of said right-of-way);

(f) then proceeding in an east-southeasterly direction along the centerline of Arizona Highway 264 until it intersects a north-south line which passes through a point 100 feet west of the westernmost structure now present at Navajo Site 57 (the location of which is identified on Navajo Exhibit 5001);

(g) then proceeding due north along said north-south line approximately 1900 feet to a point which is due west of the westernmost structure now present at Navajo Site 57; then proceeding due north an additional 100 feet;

(h) then proceeding in a generally northeasterly direction to a point immediately west of Rock Pile Windmill;

(i) then proceeding due north to the middle of the stream bed of the Moenkopi Wash;

(j) then proceeding down the middle of the stream bed of the Moenkopi Wash in a generally westerly direction to the eastern boundary of Township 32 North, Range 11 East;

(k) then proceeding due north along the eastern boundary of Township 32 North, Range 11 East approximately 5,700 feet to a point on a line running directly east from the intersection of the southern edge of the right-of-way of Arizona Highway 160 and the eastern edge of an unimproved road leading south to the eastern side of Reservoir Canyon, as shown on Nav. Ex. 4176A;

(*l*) then proceeding due west along said line to the aforementioned intersection;

(m) then proceeding in a generally northerly direction along the unimproved road leading north into Pasture Canyon, until that road reaches the intersection of a second unimproved dirt road (just north of the label "A" on Ex. 4176A); then proceeding north (where the first unimproved road turns slightly northwest), parallel to, and 200 feet from the first unimproved road, until it reaches a point 200 feet east of the southern tip of Pasture Canyon Reservoir; then following a line which is parallel to, and 200 feet to the east of, the eastern high-water mark of the Reservoir to a point due east of the northernmost high-water mark of the Reservoir; then proceeding in a generally northerly direction along the eastern edge of Pasture Canyon, against the eastern wall of Pasture Canyon, until it reaches a fence demarcating the southern boundary of the former "Government Pasture," said fence being located approximately 100 feet south of the southern boundary of Section 10 of Township 32 N, Range 11 E;

(n) then in a generally westerly direction along the aforementioned fence to the western edge of the floor of Pasture Canyon;

(o) then proceeding in a southerly direction along the western edge of the Canyon floor, against the west wall of the Canyon, to

the southern edge of the cultivated Hopi fields; then proceeding south-southwest approximately 600 feet to a point which is 200 feet due west of the northernmost highwater mark of Pasture Canyon Reservoir; then proceeding in southerly direction along a line which is parallel to, and 200 feet to the west of, the western high-water mark of Pasture Canyon Reservoir, to a point 200 feet due west of the southern tip of the Pasture Canyon Reservoir;

(p) then proceeding in a generally southerly and southeasterly direction along the western edge of the tree-line on the western edge of Pasture Canyon, passing east of Navajo Sites 100 and 108 (as shown on Nav. Ex. 4176A), until it reaches the middle of the right-of-way of Arizona Highway 160 at a point where an unimproved road on the western side of Pasture Canyon intersects with Arizona Highway 160;

(q) then following the middle of the right-of-way of Arizona Highway 160 in a generally westerly, then generally southerly direction to the northern boundary of Navajo allotment Tract No. 37 (as shown on the Dependent Resurvey of Tracts in Section 32 T–32 North, R–11 East of the Gila & Salt River Base & Meridian, Coconino County, Arizona, Officially Filed March 18, 1991, Utilizing Map 1 of 7 (1283–B), Map 6 of 7 (1283–G) & Map 7 of 7 (1283–H));

(r) then east along the northern boundary of Tract No. 37 to the tract's northeastern corner, then south along the eastern boundary of Tract No. 37 to the tract's southeastern corner, then west along the southern boundary of Tract No. 37 until it reaches the tract's southwestern corner, then south along the eastern boundary of Navajo allotment Tract Nos. 39 and 42 (as shown on the Dependent Resurvey of Tracts in Section 32 T–32 North, R–11 East of the Gila & Salt River Base & Meridian, Coconino County, Arizona, Officially Filed March 18, 1991, Utilizing Map 1 of 7 (1283–B), Map 6 of 7 (1283–G) & Map 7 of 7 (1283–H)) until it reaches the southeastern corner of Tract No. 42;

(s) then proceeding in a westerly direction along the 4700–foot elevation near or at the top of the Moenkopi Plateau, until it is at a point on the Plateau immediately above a point adjacent to an unimproved dirt road which passes between the base of the Moenkopi Plateau and a bluff or hill lying to the north, in the vicinity of Navajo Site 24 (the location of which is shown on Exhibit 5002);

(t) the proceeding in a northerly direction across the hill or bluff until it intersects an unimproved direct road just south of Moenkopi Wash; then proceeding along the midpoint of said unimproved dirt road, until the road reaches the middle of the stream bed of the Moenkopi Wash;

(u) then proceeding in a generally westerly direction along the middle of the stream bed of the Moenkopi Wash to the point of beginning.

## AMENDED FINAL JUDGMENT

### Dec. 21, 1992

This action having come on regularly for trial between October 17, 1989 and February 8, 1990 and again between July 7 and July 21, 1992; plaintiff having appeared by and through his attorneys, Arnold & Porter, defendant having appeared by and through his attorneys, Brown & Bain, P.A., and intervenors having appeared by and through their attorneys, the Native American Rights Fund; the Court having fully considered all the evidence and the entire record herein; and the Court having made its findings of fact and conclusions of law and orders as set forth in its opinions dated April 27, 1992 (Findings of Fact and Conclusions of Law re: Hopi Claims), March 13, 1992 (regarding limitations on the Court's jurisdiction to partition land to the San Juan Southern Paiute Tribe), June 18, 1992 (Order Amending Findings of Fact re: Hopi Claims), July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), September 25, 1992 (Findings of Fact and Conclusions of Law and Judgment re: Partition of the 1934 Reservation), and the other orders referenced therein; and the Court having determined that the parties are entitled to judgment (amended) as set forth herein, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

A. *Defining the Lands in Issue.*

For purposes of this Final Judgment, the term "The 1934 Reservation" shall mean all the lands within the boundaries described in Attachment A, being the legal description appearing in the Act of June 14, 1934, 48 Stat. 960.

B. *Quieting Title to that Portion of The 1934 Reservation Partitioned to The Hopi Tribe.*

1. Subject only to the trust title of the United States of America, title to the lands described in Attachment B (hereinafter "the Hopi Partitioned Lands") is hereby quieted forever in favor of the Hopi Tribe and against the Navajo Nation and all Navajo villages, clans and individuals and it is hereby declared that neither the Navajo Nation nor any Navajo village, clan or individual has or shall have any estate, right, title, lien, or interest whatever in or to the Hopi Partitioned Lands or any part thereof, and that the Hopi Tribe owns, and is entitled to possession of, the Hopi Partitioned Lands, both surface and subsurface interests, subject to the trust title of the United States, and the Navajo Nation and all persons claiming under it and its villages, clans, and individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to the Hopi Partitioned Lands.

2. Subject only to the trust title of the United States of America, title to the Hopi Partitioned Lands is hereby quieted forever in favor of the Hopi Tribe and against the San Juan Southern Paiute Tribe and its individual members and it is hereby declared that neither the San Juan Southern Paiute Tribe nor its individual members have or shall have any estate, right, title, lien, or interest whatever in or to the Hopi Partitioned Lands or any part thereof, and that the Hopi Tribe owns, and is entitled to possession of, the Hopi Partitioned Lands both surface and subsurface interests, subject to the trust title of the United States, and the San Juan Southern Paiute Tribe and all persons claiming under it and its individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to the Hopi Partitioned Lands.

3. The Hopi Partitioned Lands shall henceforth be subject to the jurisdiction of the Hopi Tribe to the same extent as is applicable to other portions of its reservation.

C. *Declaration of the Interests of the San Juan Southern Paiute Tribe in a Portion of The 1934 Reservation.*

1. For the reasons stated in this Court's order of March 13, 1992 (regarding this Court's jurisdiction over claims brought by the San Juan Southern Paiute Tribe), as supplemented by this Court's opinion dated July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), the San Juan Southern Paiute Tribe is not entitled to a partitioning of any lands in this action and the jurisdiction and authority of this Court.are limited to declaring the lands in which the San Juan Southern Paiute Tribe has an interest.

2. The San Juan Southern Paiute Tribe has a property interest in that portion of The 1934 Reservation described and set forth in this Court's opinion of July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), the location of which is generally shown on the maps attached to this judgment as Attachment C. Said lands shall hereinafter be referred to as "the Paiute Lands," although the Navajo Nation also has a property interest in a part of the Paiute Lands, as set forth in the said prior opinion.

3. The Hopi Tribe does not have any interest in any portion of the Paiute Lands.

4. Because this Court lacks jurisdiction to partition land to the San Juan Southern Paiute Tribe, this Court's declaration of the San Juan Southern Paiute Tribe's property interest in the Paiute Lands does not confer any jurisdiction to that tribe over any part of those lands.

D. *Quieting Title to the Portion of The 1934 Reservation in Which Neither the Hopi Tribe nor the San Juan Southern Paiute Tribe Has Any Interest.*

1. Subject only to the trust title of the United States of America, title to all of The 1934 Reservation, excepting only the Hopi Partitioned Lands and the Paiute Lands, is hereby quieted forever in favor of the Navajo

Nation and against the Hopi Tribe and all Hopi villages, clans and individuals and it is hereby declared that neither the Hopi Tribe nor any Hopi village, clan or individual has or shall have any estate, right, title, lien, or interest whatever in or to such lands or any part thereof, and that the Navajo Nation owns, and is entitled to possession of, such lands, both surface and subsurface interests, subject to the trust title of the United States, and the Hopi Tribe and all persons claiming under it and its villages, clans, and individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to such lands.

2. Subject only to the trust title of the United States of America, title to all of The 1934 Reservation, excepting only the Hopi Partitioned Lands and the Paiute Lands, is hereby quieted forever in favor of the Navajo Nation and against the San Juan Southern Paiute Tribe and its individual members and it is hereby declared that neither the San Juan Southern Paiute Tribe nor any of its individual members have or shall have any estate, right, title, lien, or interest whatever in or to such lands or any part thereof, and that the Navajo Nation owns, and is entitled to possession of, such lands, both surface and subsurface interests, subject to the trust title of the United States, and the San Juan Southern Paiute Tribe and all persons claiming under it and its individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to such lands.

3. All of The 1934 Reservation, excepting only the Hopi Partitioned Lands, is and shall be subject to the jurisdiction of the Navajo Nation to the same extent as is applicable to other portions of its reservation.

### E. Allotments Not Affected.

This Judgment does not affect the title, possession, and enjoyment of lands heretofore allotted to Hopi and Navajo individuals for which patents have been issued. All Hopi allotments are located on land partitioned to the Hopi Tribe, and those allotments shall be subject to the jurisdiction of the Hopi Tribe. All Navajo allotments are located on land partitioned to the Navajo Nation, and those allotments shall be subject to the jurisdiction of the Navajo Nation.

### F. Implementing the Partitioning.

1. 25 U.S.C. § 640d–18(b) and 18(c) requires the Secretary of the Interior to provide for the survey, location of monuments, and fencing of boundaries of the Hopi Partitioned Lands and to do so within twelve months of the final order of partition herein. For purposes of that requirement and all other provisions in this judgment that refer to the "final order of partition" or the like, entry of this judgment shall be deemed to be the final order of partition; Provided, however, that if any party files a notice of appeal, then the date of the final order of partition shall be deemed to be the date a mandate is issued by the Court of Appeals. The Court hereby retains jurisdiction of this action to resolve any issue that may arise relating to such survey; Provided, however, that the parties shall first attempt to resolve any such issue by agreement and if agreement cannot be reached and the Court is required to resolve such issue, the Court shall assess attorneys' fees, court costs and incremental surveyors' expenses against the non-prevailing party. Upon completion of such survey, the parties shall cause to be expeditiously filed with the Court a certified copy of the survey findings and determination.

2. Within 90 days of the final order of partition, the Hopi Tribe shall install a trough outside the Hopi Partitioned Lands and a pipe from the Little Hollow Place Windmill, which shall deliver and contain sufficient water to provide for the livestock belonging to Navajo stockmen in the area, up to a maximum of one half of the water produced by Little Hollow Place Windmill. The pipe and trough shall thereafter be maintained by the Navajo Nation.

3. Within 90 days of the final order of partition, the Navajo Nation shall install a trough inside the Hopi Partitioned Lands and a pipe from the Rock Pile Windmill, which shall deliver and contain sufficient water to provide for the livestock belonging to Hopi stockmen in the area, up to a maximum of one half of the water produced by Rock Pile Windmill. The pipe and trough shall thereafter be maintained by the Hopi Tribe.

4. The public is granted a license and easement to utilize the portion of the Hopi Partitioned Lands lying south of Pasture

Canyon Reservoir dam for recreational purposes. If this area ceases to be used as a park, the Hopi Tribe may petition this Court for termination of this license and easement after public notice and hearing and this Court retains jurisdiction to hear any such petition.

5. The Hopi Tribe is granted a license and easement to improve or maintain the ditches running across the Navajo farms in the northern part of Pasture Canyon, which access shall occur only after 10 days' advance written notice to the Navajo Nation and to the individual Navajos farming in Pasture Canyon. This license and easement does not allow the Hopi Tribe to interfere with Navajo use of the springs in Pasture Canyon.

6. The Navajos farming in Pasture Canyon shall prevent their stock from destroying or damaging the irrigation ditches running through the upper part of Pasture Canyon and this Court retains jurisdiction to consider any injunctive relief and/or damage claims against the Navajo Nation respecting disturbance or damage to the irrigation ditches by Navajo individuals or their livestock.

7. Those Navajo families presently using Pasture Canyon Reservoir are granted a license and easement to water their livestock. This license and easement does not authorize grazing of Navajo livestock within the section of Pasture Canyon partitioned to the Hopis, including at the sides of the Reservoir, excepting for that grazing impossible to prevent while watering such animals. If the Hopi Tribe chooses to build a pipeline from the Reservoir to troughs on the eastern and western sides of the Reservoir (outside of the boundary of the Hopi Partitioned Lands), or some other measure which will ensure a continuous water supply for such Navajo livestock, then the Hopi Tribe may petition this Court for termination of this license and easement and this Court retains jurisdiction to hear any such petition.

G. *Declaring Certain Restrictions on Development to be Ended.*

The restrictions on development on a portion of the 1934 Reservation, as codified by 25 U.S.C. § 640d–9, are deemed ended, except as provided in this Court's order granting, in part, the Hopi Tribe's motion for partial stay of the judgment.

IT IS FURTHER ORDERED that each party shall bear its own costs and attorneys' fees incurred to date in connection with this action.

IT IS FURTHER ORDERED the Court having disposed of all claims asserted herein against or by all parties, this Judgment is final.

ATTACHMENT C

San Juan Southern Paiute Tribe
Southern Use Area

Paiute exclusive use area in 1934.

Paiute/Navajo joint use area in 1934.

Attachment C

Tse Ya Toe
Spring

San Juan Southern Paiute Tribe
Northern Use Area

Paiute/Navajo joint use
area in 1934.

Attachment C

ORDER RE: HOPI TRIBE'S MOTION
FOR PARTIAL STAY PENDING
APPEAL

Dec. 21, 1992

On September 25, 1992, this Court issued its Findings of Fact and Conclusions of Law and Judgment re: Partition of the 1934 Reservation. The restrictions on construction and development within the 1934 Reservation, known as the "Bennett Freeze" and codified at 25 U.S.C. § 640d–9(f), were lifted. The Hopi Tribe moved to stay this portion of the judgment pursuant to Fed.R.Civ.P. 62.

 Rule 62(c) codifies the power of a court to maintain the status quo pending appeal, and to ensure the effectiveness of an eventual judgment. *Tribal Village of Akutan v. Hodel,* 859 F.2d 662, 663 (9th Cir. 1988). The standard for stays pending appeal is similar to that for the grant of a preliminary injunction. *Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.1983). To obtain a preliminary injunction, the moving party must show both the likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits are raised, and that the balance of hardship tips sharply in its favor. *Johnson Controls v. Phoenix Control Systems,* 886 F.2d 1173, 1174 (9th Cir.1989).

 While the Hopi Tribe has not established that it has a fair chance of success on the merits of its appeal, this Court acknowledges that it has ruled on difficult legal questions, including the determination of what constituted "use, occupancy, or possession" in 1934, and the proper standards for partition. Thus, the Court will turn to whether the balance of hardships tips "sharply" in favor of the Hopi Tribe.

The Hopi Tribe argues that if no restriction on Navajo development is kept in place pending resolution of the appeal, the Navajo Nation will engage in a program to settle Navajos in new homesites along the boundaries of the land this Court partitioned to the Hopi Tribe. The Hopi Tribe fears that this new settlement will prevent the Hopi Tribe from obtaining any effective relief on appeal. The Hopis believe Navajo settlement may affect the equities of partitioning the Reservation if the case is remanded to this Court after appeal, and they are concerned that

once settled, the Navajos may refuse to relocate if that land is later partitioned to the Hopi Tribe. This latter concern is well grounded, considering the refusal of a number of Navajos to relocate from the Hopi Partitioned Lands in the 1882 Reservation.

The Navajos argue that the continuation of the Freeze will work great hardship on the individuals subjected to its terms, including more years of living in substandard housing, without adequate living quarters, electricity, or running water. Although the San Juan Southern Paiute Tribe also intends to appeal the judgment, the Paiute Tribe opposes the reimposition of the Freeze, citing its members' needs for housing, home improvements, water, electricity and government offices and facilities.

The Hopis respond that limited harm will come to the Navajos if the Freeze is maintained. First, they argue that they seek a stay in only a limited area within the original Bennett Freeze area. However, this area includes major population concentrations, such as Cameron and the Gap. Second, the Hopi Tribe argues that repairs and renovations to existing homesites are possible with the Freeze in place, given the existing procedures which allow appeal to the Secretary of Interior if necessary for the health and safety of Navajo residents if Hopi consent is denied. Moreover, the Hopis argue that since 1988, it has been their policy to approve necessary repairs and renovations of existing structures, and to approve same-size replacement structures for dilapidated homes. However, the appeal procedure through the Secretary of Interior is often a slow and expensive process and many Navajos have been living in substandard living conditions despite these appeal procedures and the Hopi policy to approve "necessary" repairs. On this Court's tour of the Bennett Freeze area in June, 1992, it was obvious that some Navajos did not have the shelter necessary for their "health and safety" and were living in dilapidated, nonweather-proof homes.

In its September 25, 1992 Findings, this Court found, "Residents of the Western Navajo Reservation, both Navajo and Hopi, have waited long enough to see this litigation resolved, and it would be inequitable to con-

tinue the restrictions on repair and addition to homes and the development of services essential for comfort and sanitation." It is still this Court's conclusion that the continued widespread imposition of the Freeze would be inequitable and unjustified.

Here, the balance of overall hardships tips sharply in favor of the Hopi Tribe with regard to new Navajo settlement in proximity to the area partitioned to the Hopi Tribe. Allowing more Navajos to settle in this area may indeed prevent the Hopi Tribe from obtaining any effective relief on appeal. This Court will thus grant, in part, the Hopi Tribe's motion for partial stay pending appeal.

Navajos not living within the area delineated as the joint use area in this Court's September 25, 1992 Findings on that date may not establish a homesite, including building new structures or relocating to existing structures, within the joint use area.

Because the Hopi Tribe is primarily concerned with more *people* moving into the area pending resolution of the appeal, this Court will not continue restrictions on repair and construction of structures for Navajos who were living within the joint use area on September 25, 1992. These Navajos may engage in repair and addition to their homes, and may build new structures *on their present homesite* for use of immediate family members living at that site on September 25, 1992, without the approval of the Hopi Tribe. The Navajo Nation may complete any improvements within the area partitioned to it, limited to the construction of new roads, or facilities for electrical or water service. However, the presence of these improvements will not impact the equities of any subsequent partition if this case is remanded by the Ninth Circuit for that purpose.

A stay of the judgment will not be granted as to land outside of the joint use area, and the Freeze is lifted in this area.

This partial stay meets the primary Hopi concern that more Navajos will settle in the area surrounding the land partitioned to the Hopi Tribe, possibly foreclosing effective relief on appeal. With this partial stay in place, the number of Navajo families potentially subject to relocation after appeal will not increase, but the Navajos now living in this area will be allowed to improve their living conditions.

No bond will be required.

Accordingly,

IT IS ORDERED granting the Hopi Tribe's motion for partial stay pending appeal in part, and denying the motion in part. Navajos not living within the area delineated as the joint use area in this Court's September 25, 1992 order on that date may not establish a homesite, including building new structures or relocating to existing structures, apart from their homesite, within the joint use area. Navajos who were living within the joint use area on September 25, 1992 may engage in repair and addition to their homes, and may build new structures on their present homesites, for use of immediate family members living at that site on September 25, 1992, without the approval of the Hopi Tribe. The Navajo Nation may complete any improvements within the area partitioned to it, limited to the construction of new roads, or facilities for electrical or water service. A stay of the judgment will not be granted as to land outside of the joint use area.